Bernard Ryan, P. J.
On December 14, 1953 a boy who was born March 23, 1943 and therefore was between 10 and 11 years of age was admitted to the Rochester State Hospital apparently pursuant to the provisions of section 71 of the Mental Hygiene Law. He was assigned to the male reception ward and became known as patient “ X ”. The diagnosis was childhood schizophrenia. He was the subject of intense study and the trial of various treatments. He remained continuously in the male reception ward up to and including March 26, 1955.
On January 6, 1955 Nicholas Schoff, aged 84 and senile, was admitted to the Rochester State Hospital. He, too, was assigned to the male reception ward and remained there up to and including March 26, 1955.
On one level of the reception ward there was a day room, adjoining it an alcove, or recessed area, and beyond that another room called “ The Cottage ”. On March 26, 1955 there were 11 attendants assigned to the reception service in which ward there resided 55 to 66 patients, the exact number not being established in the testimony. The court understands the 11 attendants to be the number assigned to duty in 24 hours, not 11 each 8-hour tour of duty. The Cottage, so-called, was really a dormitory. Schoff was assigned there. The dormitory for patient “X” was upstairs over the day room.
On the date mentioned one of the attendants, Hayes, was standing in the Cottage area near the doorway leading to the washroom. He had just finished shaving a patient. Nicholas Schoff was standing nearby waiting to be the next one shaved. The locations of Hayes and Schoff were indicated on Exhibit 3 *941 by the witness Hayes upon the examination before trial, which exhibit, so marked, was received in evidence on the trial. Patient “X” came running into the Cottage and he pushed Schoff with his hands. Schoff fell down and sustained personal injuries including a fracture of the neck of the right femur. Schoff was transferred to the infirmary ward where his injuries were treated and where he remained in traction until late in May, 1955. He was first able to get out of bed on June 16, 1955 and as late as September, 1955, when he was transferred from the infirmary ward to another ward, he was unable to do more than get out of bed and sit in a chair. On November 5, 1957, a few days prior to the trial, a physical examination disclosed that Schoff was unable to navigate, had a tendency to fall, had weakness in both extremities and was chair-ridden. His present condition is partly due to arthritis. Prior to the accident he was able to walk although he was feeble and used a cane. In the words of the supervising psychiatrist in charge of male reception Schoff, as observed by him before the accident, was 11 somewhat unsteady on his feet. It would not take much to knock him over.”
Suit is brought by the committee of his person and property to recover damages for Schoff’s personal injuries, pain and suffering. The suit is based on negligence of the State in the operation and control of the Rochester State Hospital in the control and custody of its wards. To be specific the complaint is that patient “ X ” should have been so watched and controlled that the accident to the elderly patient would not have occurred. It is not suggested that patient “X” was vicious or assaultive. Admittedly he was impulsive. He had a proclivity to run in and about the various rooms of the reception ward. This had been observed by attendants and had been noted in the hospital records. The boy would run out of the kitchen sometimes. Somebody might have his seat in the kitchen and he would run out of the kitchen. The hospital attendant testified that while the boy never moved too fast he would characterize his movement as a run. The medical director testified that when he observed the boy it was not a fast run. It was more like a scurry. The boy had a seat in the ward which he seemed to think belonged to him. If anyone would sit in that seat he would get a little bit upset about it. Sometimes when he had to go to the bathroom he would get a little upset, he would jump up and down and he would run into the bathroom. The Cottage was for the elderly group of patients and Schoff was confined there. Although there is testimony that the patient “ X ” was restricted to the day room, the porch *942 and the dining room only, there is also testimony that he was free to go into the Cottage for the purpose of going to the bathroom. There is no proof that the patient 1 ‘ X ” had previously run into other people, either patients or attendants.
Claimant relies upon the proposition that inasmuch as the proclivities of patient “ X ” were well known to the doctors and attendants the foreseeability of the accident to Schoff was evident and measures to control patient “ X ” should have been taken. The Attorney-General relies upon the proposition that the trend in psychiatric procedure for the care of the mentally ill is to allow as much freedom and social contact as possible and requests us to find that ‘ ‘ to restrict ‘ X ’ in any way, even though the hospital officials were aware that at times he was given to running in and about the ward, would have been a detriment to his treatment as a mentally ill person.” In other words we are told that the care of the boy was proper psychiatric treatment and on that ground asked to relieve the State of New York from liability for the injuries to its ward Schoff.
It seems to us that this argument overlooks the point at issue. What here concerns us is the care afforded to the patient Schoff. We are mindful that the care of the patient “ X ” presented an administrative problem to the institution. It must be unusual to have persons of such tender years admitted as patients in a mental hospital. The testimony is that there were not enough children patients to justify a separate ward for their care. The testimony further is that the stay of any patient on the reception ward varies in the individual case. Sometimes the entire confinement is lived there and sometimes patients are transferred to other wards within a month. Whatever the problems, can it be said that it was properly within the realm of administrative discretion to continue to permit a disturbed and impulsive 12-year-old the freedom of a ward where aged and infirm patients might be standing or walking around? Let us assume a situation entirely outside of an institution for the care of the mentally afflicted. Let us assume that a physically infirm but not senile octogenarian, and a physically active, normal, 12-year-old boy were dwelling in the same household. If the youngster was given to scurrying or running about a living room, would not some warning to the youngster have been expected from the head of the household occupied by these two individuals? Would there not have been required from a reasonably prudent person some control of the boy? The testimony here is that “ X ” was not disciplined for his actions, that other inmates did not need “ protection because he did not necessarily run into anyone. He would run into the bathroom.” With these pro *943 clivities known and recorded was reasonable care exercised with respect to the elderly patients in the ward, including Schoff? We are of the opinion that the risk that some day the boy would run into and knock down and injure an infirm patient was reasonably to be perceived. We believe the proof here meets the test of foreseeability and that the elements of want of due care have been established. Obviously there can be no contributory negligence charged to Schoff under the circumstances. Hence liability ensues.
The measure of damages is such sum as will compensate Schoff for pain and suffering and permanent disability. There is no loss of earnings and there are no hospital or doctor bills. Considering the age and physical and mental condition of the injured person we believe that ' the sum of $3,000 will compensate.
Judgment in that amount in favor of the claimant committee is directed. The court has marked the requests to find submitted by the Attorney-General. The claimant submitted no requests.