Henry W. Lengyel, J.
This is a claim against the State of New York based on the alleged negligence of the State of New York and its employees, arising out of an assault committed on October 20, 1959, against the claimant, “ A A ”, an inmate of Rockland State Hospital, by another inmate of said hospital.
Rockland State Hospital, located at Orangeburg, New York, is owned and operated by the State of New York for the observation, treatment and care of the mentally ill.
Claimant, “A A ”, was admitted from Bellevue Hospital in New York City to Rockland State Hospital on August 13, 1959, and was given a tentative diagnosis of ‘1 primary behavior disorders in children, conduct disturbance ”, At the time of admission claimant was 12 years of age. After admission said claimant was placed in a children’s ward but because of his violent exceptions to being placed with children he was transferred to wards which contained older patients. It is of interest to read the statement contained in the copy of said claimant’s hospital record: “ This boy has been a constant trial and tribulation since the hour of his admission. Review of the ward notes indicates that the boy has been transferred and lodged out from one ward to another, constantly because he created a rumpus each time near nightfall, at which time he was to be bedded down with his peers of his own age. He protests violently against residing on a ward with children his own age and cannot ever explain correctly the reason why he feels this way. * * * Remarkably enough, the boy has continually pleaded to be placed on solitary confinement, or on a disturbed ward without giving any valid reason for his desires. Since his admission he has been variously lodged on wards 3, 4, 5 and back to 3, and back to 5 and then to 16.” Eventually, several weeks before October 20, 1959, said claimant was lodged in and remained in Ward 5 which is located in the building known as “ Male Reception ”. The “ Male Reception ” building contained 12 wards and was under the supervision of Dr. Chlenoff who was the State’s principal witness during the course of the *1006 trial. Dr. Chlenoff: testified that except for a specific ward for children in “Male Reception ” and another for old or senile patients, all of the other wards, including Ward 5, received all patients indiscriminately. Apparently no distinction was made for age, prior history, diagnosis, propensity, prognosis nor degree or character of psychotic involvement. During cross-examination, Dr. Chlenoff stated in response to questions about the patient composition of Ward 5, the following:
“ Q. But all other patients might be found in that room; is that correct, Doctor? A. Up to a certain age.
“ Q. What age is that? A. I certainly wouldn’t place there any youngster of — let us say — ten, eleven years old.
‘ ‘ Q. Did you have a separate ward for children of that age ? A. At that time we had.
“ Q. What ward was that? A. That was Ward 6.
“ Q. What ages went into Ward 6? A. We were rather flexible, but at times we would keep people there 14 and younger. ’ ’ When asked on redirect examination why said claimant was placed in Ward 5, Dr. Chlenoff stated that although there was a ward for younger patients claimant was a bit too tall for his age and that knowing he did not get along with younger people and as he was too tall, his physician decided to lodge him in Ward 5.
We are cognizant of the severe administrative burdens placed upon our hospitals for the mentally ill. However, no matter what the administrative problems, the State has accepted the responsibility for the care of such patients. We do not believe the State has fairly met its responsibilities when it permits a 12-year-old patient to be lodged in a ward with varied types of mentally ill patients, some admittedly violent, because that 12-year-old is tall for his age and had violent tantrums when placed in a children’s ward. (Schoff v. State of New York, 8 Misc 2d 940, 942.) The State’s principal witness stated he would not place a 10- or 11-year-old in that ward. We do not think the age of 12 marks such growth to maturity as would justify placement in an adult ward. In fact we consider the distinction between a 10-, 11-, or 12-year-old to be so slight that the statement of Dr. Chlenoff that he would not place a 10- or 11-year-old in that ward was tantamount to an admission that it would be an improper standard of supervision and medical treatment to place a 12-year-old in that ward. In so doing, the State obviously was playing with psychic dynamite and when it was, we believe expectably, exploded, the State must be held liable no matter what the direction or form of *1007 the blast. As was stated by Chief Judge Cakdozo in Palsgraf v. Long Is. R. R. Co. (248 N. Y. 339, 344): ‘£ The risk reasonably to be perceived defines the duty to be obeyed”. (See, also, Excelsior Ins. Co. of N. Y. v. State of New York, 296 N. Y. 40; Flaherty v. State of New York, 296 N. Y. 342; McPartland v. State of New York, 277 App. Div. 103.)
It should also be noted that Ward 5 shared a common hallway with and across from Ward 6, the children’s ward. There were 12 patients in Ward 6 on October 20, 1959, and although the State’s witness, Mr. Mosa, the ward attendant on Ward 6, was evasive and hostile, it was established to our satisfaction that there were many beds available in Ward 6 for said claimant, not only on the day of the assault but also prior thereto. There was no problem of overcrowding which forced assignment of said claimant to Ward 5.
There was no justification in law or fact, legally or morally, or medically to house said claimant in Ward 5.
If the above had been the only action by the State preceding the assault, we would have found liability on the part of the State. However, the record shows further acts on the part of the State which strengthen a finding of liability.
Approximately a week before the assault in question, the said claimant stated that he, with other patients and a ward attendant, witnessed and watched one younger male patient commit an act of sodomy (buggery) with another male patient. He was cross-examined competently and strongly on this testimony but other than minor discrepancies his testimony stood up. The State did not offer any proof to contradict this testimony by the claimant and the court believes and finds this activity took place. The hospital officials permitted this 12-year-old to remain in the ward when it should have been obvious that a child might be subject to such acts of degeneracy.
On the night in question, October 20, 1959, the said claimant testified that just before he went into his dormitory to go to bed he saw the ward attendant, a Mr. Williams, leave the ward. He stated that he went to bed and was there a few minutes when another patient, John Nichols, ordered him to go to the clothing closet which he did. Upon arrival at the clothing closet he met two other patients, James Smith and Kenneth Cope. That a few moments after entry into the closet he was thrown to the floor, a knife was held at his throat, his undershorts were ripped down and patient Smith committed an act of sodomy upon his body, namely buggery. This activity was stopped by the arrival of an attendant, Mr. Mosa, but not *1008 until after it had occurred. The State’s Attorney-General strongly examined said claimant on this part of his testimony hut could not develop other than what we consider normal discrepancies which did not refute the fact that this act had been committed on this claimant essentially at the time, place and manner testified to by said claimant. “ A A’s ” testimony was further substantiated by Exhibits 31 and 32, which were investigation reports made by Dr. Emmanuel and by Dr. Chlenoff. In Exhibit 31, Dr. Emmanuel stated that a physical examination of claimant showed that his shorts were ripped in the back down the center and that his anus was found to be edematous and erythematous at 12 o’clock and 6 o’clock, with a fissure present at 1 o ’clock. In Exhibit 32, Dr. Chlenoff in his capacity as supervising psychiatrist interviewed the two ward attendants involved in this action, Mr. Mosa and Mr. Williams. From this report it was developed that Mr. Williams, attendant on Ward 5, had left the ward without permission although he had asked Mr. Mosa, attendant on Ward 6, to cover for him; it was also developed that when Mr. Mosa went to Ward 5 he found patients Smith, Nichols, Cope and “ A A ” in the clothing room of AVard 5. The State objected to the receipt of Exhibit 32 initially as being based on hearsay and then fined its objection down to the last sentence contained in that exhibit. AVe reserved decision on the objection and accepted the report subject to a motion to strike out. AVe now sustain the State’s objection to the last sentence in that exhibit and have not considered said sentence in any respect in arriving at our decision. The balance of the report, Exhibit 32, we consider as being properly presented at the trial and we receive the same in evidence without reservation. We do not consider this portion of the report to come within the rules laid down in Cox v. State of New York (3 N Y 2d 693). This investigation and report was made by the supervising psychiatrist for these wards and in pursuance of his official duties. As such we consider it to come clearly within the provisions of CPLR 4518. The portion of the report admitted into evidence contained statements of the ward attendants as to what they did and what they saw. It did not, as in the Cox case, contain statements of what some third party had told them. It was made on information ‘1 imparted by persons who were under a duty to impart such information ’ ’ (Johnson v. Lutz, 253 N. Y. 124, 128).
It was stated in Gould v. State of New York (46 N. Y. S. 2d 313, 316):
*1009 ‘ ‘ Insufficiency of attendants in a mental institution is an act of negligence, on the part of the State. Curley v. State, 148 Misc. 336, page 339, 265 N. Y. S. 762.
“ The State is duty bound to furnish inmates of its hospitals for mental defectives with every reasonable precaution to protect them from injury, either self inflicted or otherwise. Shattuck v. State, 166 Misc. 271, 2 N. Y. S. 2d 353, affirmed 254 App. Div. 926, 5 N. Y. S. 2d 812; Martindale v. State, 244 App. Div. 877, 281 N. Y. S. 686, affirmed 269 N. Y. 554, 199 N. E. 667”.
In the case at hand the evidence discloses that Ward 5 was in the shape of an “ L ”. The long end of the “ L ” was approximately 150 feet in length and contained the entrance to the ward, the dayroom and approximately 21 small individual rooms on the left side of the ward when one stands in the entrance looking to the rear of the ward and the clothing closet, several utility rooms and the ward office on the right side. The short end of the “L” contains 5 dormitory type wards and a utility room. This ward on the night in question contained 43 patients and yet it was under the control of but one attendant, Mr. Williams. The record shows that the State knew of the assaultive disposition of many of the inmates of this ward. Leaving such a ward under the care of one attendant was negligence on the part of the State. In Rossing v. State of New York (47 N. Y. S. 2d 262, 263) it was stated: “The State, in having at the time but one attendant present looking-after 56 inmates who were liable to be assaultive or destructive, failed in its duty toward the claimant. ® * * The degree of care which the law exacts from those in charge of institutions for the insane towards its patients is such reasonable care and attention for their safety and the safety of others as their mental and physical condition, if known, may require, and should be in proportion to the physical or mental ailments of such patients. Weihs v. State, 267 App. Div. 233, 45 N. Y. S. 2d 542; Jones v. State, 267 App. Div. 254, 45 N. Y. S. 2d 404.” Moreover, in the present case, not only was Ward 5 lacking in adequate supervision but also the one attendant assigned to the ward absented himself therefrom without permission. Granted attendant - Williams asked attendant ■ Mosa to watch his wárd, which Mosa agreed to do. This, not only created an increase in patients to be supervised by one attendant, from 43 to 55; but also increased the space to be covered by one attendant. It also allowed the unsupervised time in which to get the *1010 claimant into the clothes closet and to commit the assault. It is also of interest that when Mr. Mosa learned there were patients in the clothes closet he had to knock on the do nr of the closet and request that it be opened as it was lockephfrom the inside and he did not have a key. Such a situation in an institution for the mentally ill and in a ward which contained patients who had suicidal tendencies is inexplicable.
It is our opinion and we find that the State was negligent in its treatment and care of the claimant, “ A A ”, that the State’s negligence was the proximate cause of the physical and mental damage sustained by said claimant, and that said claimant was not contributorily negligent.
The State made the usual motions for dismissal at the end of claimants’ case and at the end of the whole case. We reserved decision on both of these motions. We now deny both motions insofar as they relate to the infant claimant. We grant such motions insofar as they relate to the claim of “R A” individually. No proof was presented to us on the question of loss of services; and, in fact from the proof presented to us it is clear there was no loss of services.
These claims have not been assigned or submitted to any other court or tribunal.
During the course of the trial the claimant’s attorney offered into evidence the hospital records of James Smith, Kenneth Cope and John Nichols (Exhibits 24, 25 and 26). The State objected to the receipt in evidence of these records on the physician-patient privilege. It also objected to those portions of the record based on hearsay and to any entry in the hospital records made following October 20, 1959. We permitted the records to be admitted into evidence subject to a motion to strike. We feel that the law of New York relative to the admission of hospital records has been clearly and succinctly set forth in Torres v. State of New York (14 Misc 2d 246) and Boykin v. State of New York (13 Misc 2d 1037, affd. 7 A D 2d 819). Under the authorities cited in these two cases we are constrained to rule that the three hospital records cannot be admitted into evidence to show the propensities, diagnosis and prognosis of the three patients involved in the clothing room incident with “A A”. As these hospital records were primarily offered for such purpose we sustain the objection of the State to Exhibits 24, 25, and 26 and grant the State’s motion to strike them from the record, and they have not been considered by this court. We believe that we should point out that we do not agree with our ruling on these hospital records but have so ruled because it has been so established by higher *1011 courts setting forth precedent which we must follow. It is our opinion that an eminently more equitable position regarding the question of physician-patient privilege in State hospital cases, and one which would accurately apply to the case at hand, has been set forth in Scolavino v. State of New York (187 Misc. 253, mod. on other grounds 271 App. Div. 618, affd. 297 N. Y. 460).
It occurs to this court that by the application of the case law set forth in the Torres and Boykin decisions {supra) as to propensities, diagnosis and prognosis; and the application of Cox v. State of New York (3 N Y 2d 693, supra) to hearsay statements in hospital records, we have placed extremely heavy burdens upon claimants with a justifiable claim against the State of New York. Certainly the State will use these decisions, allegedly as a shield to protect the patients but actually as a sword to defend the State. We should perhaps consider whether we are honing too keen an edge for that sword.
Having determined liability against the State, we now come to the question as to the effect of the assault of October 20, 1959 upon the infant claimant. There is no question that said infant was suffering from a psychological disorder prior to the assault. The record clearly shows his difficulties at home which led to his commitment to Bellevue Hospital and thence to Rockland State Hospital. The fundamental question to be determined is whether or not his admittedly pre-existing mental disturbance was so aggravated and exacerbated by the assault as to become a much more severe mental disturbance, one less susceptible of improvement through psychiatric assistance.
It is the State’s position that the said infant was suffering from a chronic schizophrenic process when admitted to Rock-land State Hospital and that his condition today represents an unbroken line of development as a schizophrenic. It is this court’s opinion that the State’s position does not square with the evidence received by the court, particularly the hospital record of said infant. Dr. Chlenoff, the State’s only medical witness, unfortunately assumed a hostile and evasive posture as a witness. In fact he seemed at times to be an advocate trying to protect the State rather than an expert psychiatrist presenting to the court an opinion based on his expert knowledge of both the infant claimant and the field of psychiatry. When we examine the record, we find that Dr. Chlenoff had very slight contact with the infant claimant at the State hospital.
It is of value to note the diagnoses contained in the hospital record. At Bellevue Hospital the said infant was diagnosed as schizophrenic. There was also reference in the Rockland *1012 State Hospital record to a schizophrenic condition. Dr. C. Munn at one point in the record diagnosed said infant as suffering from a primary behavior disorder problem but also stated that “there is much of the schizophrenic about this boy”; and Dr. C. Walker, Sr., clinical psychologist, stated that “it is felt that in the terms of diagnosis this boy is basically schizophrenic.” However, despite these references to schizophrenia the staff psychiatrists who actually examined this infant at Rockland State Hospital continually developed the diagnosis of “primary behavior disorders in children, conduct disturbance”. In fact, Dr. Emmanuel stated that “ This is a fully oriented 12 year old adolescent who has superior intelligence level. There is no evidence of psychotic symptomatology. The patient is obviously a simple behavior problem and a typical product of a broken home.’’ (Italics added.) As Dr. Emmanuel was the staff psychiatrist primarily charged with the medical care of said infant it seems to us that his diagnosis must be accorded great weight. Also there is the fact that this diagnosis was concurred in by Dr. C. Munn, supervising psychiatrist, as well as by Dr. Jacobs and Dr. West, staff psychiatrists at the State hospital. In fact Dr. Chlenoff himself signed the convalescent status order for said infant and set forth over his name the diagnosis “ primary behavior disorders in children, conduct disturbance, much improved ’ ’. On the trial he explained the difference in his 1959 diagnosis from his trial diagnosis as being merely a form statement closing out the said infant’s hospital record. It is of interest to note that the State did not present as expert witnesses those psychiatrists who had actively and actually examined the said infant in 1959, particularly Dr. Emmanuel and Dr. Munn. Instead the State relied upon Dr. Chlenoff who had had small personal contact with said infant and who at the trial not only disagreed with the diagnosis of the State psychiatrists who had had close personal contact with said infant but also with his own 1959 diagnosis.
The expert witnesses for the claimants were Dr. Leedy, a well-qualified psychiatrist, and Dr. Gruen, an exceptionally well-qualified psychologist. Both Dr. Leedy and Dr. Gruen disagreed with Dr. Chlenoff’s diagnosis of schizophrenia prior to October 20. Dr. Leedy agreed with Dr. Emmanuel that prior to the assault this infant was suffering from a primary behavior disorder in children which he characterized as a transient maladjustment. He further rendered the opinion that the assault of October 20 caused the infant to be precipitated into the much more serious type of mental disturbance of schizo *1013 phrenia. Dr. Gruen also disagreed with Dr. Chlenoff’s diagnosis prior to the assault. He in fact stated that “ the pattern that he showed in his testing at the State Hospital was the reverse of what you ordinarily get in a schizophrenic pattern ”. Although Dr. Gruen did not use the terminology of the State psychiatrists or of Dr. Leedy for the infant’s condition prior to the assault he did denominate it a behavior disorder. Dr. Gruen did disagree with both Dr. Chlenoff and Dr. Leedy as to their present diagnosis of schizophrenia. He stated there had been a schizoid type of development in this infant which might at times have looked like schizophrenia and which might ultimately lead to a schizophrenic condition, but that it had not reached that state at this stage in the infant’s development. However, both Dr. Gruen and Dr. Leedy were in agreement that the assault of October 20 was a powerful psychological trauma which had a markedly adverse effect upon this infant’s psychological development and which severely impaired his prognosis for recovery from mental disturbance.
Obviously from the testimony of these three experts we are in a field which cannot be characterized as an exact science. However, because something is difficult of definition or proof does not mean it can be ignored or walled offi from consideration by the courts. As was stated in Ferrara v. Galluchio (5 N Y 2d 16, 21): “ Freedom from mental disturbance is now a protected interest in this State. ‘ [T]he only valid objection against recovery for mental injury is the danger of vexatious suits and fictitious claims, which has loomed very large in the opinions as an obstacle. The danger is a real one, and must be met. Mental disturbance is easily simulated, and courts which are plagued with fraudulent personal injury claims may well be unwilling to open the door to an even more dubious field. But the difficulty is not insuperable. Not only fright and shock, but other kinds of mental injury are marked by definite physical symptoms, which are capable of clear medical proof. It is entirely possible to allow recovery only upon satisfactory evidence and deny it when there is nothing to corroborate the claim, or to look for some guarantee of genuineness in the circumstances of the case. The problem is one of adequate proof, and it is not necessary to deny a remedy in all cases because some claims may be false. The very clear tendency of the recent cases is to refuse to admit incompetence to deal with such a problem, and to find some basis for redress in a proper case. ’ (Prosser on Torts, § 34, pp. 212-213.) ” See, also, Battalla v. State of New York (10 N Y 2d 237, 242) wherein it was stated: “ In the difficult cases, we must look to the quality and genuine *1014 ness of the proof, and rely to an extent on the contemporary sophistication of the medical profession and the ability of the court and jury to weed out the dishonest claims.” We must take the proof submitted to us on balance to determine whether or not we have a proper case for redress. It is our opinion that we have such a case. We find that the infant “A A” was suffering from a childhood behavior disorder when admitted to Eockland State Hospital. We further find that the assault of October 20 to aggravated and exacerbated that pre-existing condition as to cause it to shift to the much more acute disturbance of severe chronic psychosis under whatever diagnostic category or terminology it may be placed for classification.
The only testimony presented to us on the dollar question of damages was the testimony of both Dr. Leedy and Dr. G-ruen to the effect that intensive and extensive individual therapy is necessary if the infant claimant is to be rehabilitated. They stated that three to five years of such individual therapy at a residential treatment center is required and the cost of such treatment was approximately $10,000 a year. They also stated there would be a need, after the individual therapy, for further psychotherapy on a group basis.
We have not discovered many guidelines in the New York cases which assisted in the evaluation of damages. Apparently there have not been many cases where slight, albeit odious, physical impact has produced what is essentially and only severe psychic pain and suffering. Certainly we are more accustomed to evaluating physical injury. However, in what we like to believe is an enlightened age, is not damage to the mental integrity of the individual to be considered at least as serious as severe physical injury?
We find that the infant claimant is entitled to an award in the sum of $90,000 and render judgment against the State of New York in that amount.