Emery R. LETOSKI and Mary
Letoski, his wife

v.

UNITED STATES of America, FOOD
AND DRUG ADMINISTRATION,
and Bruce Dandbridge.

Civ. No. 76–307.

United States District Court,
M. D. Pennsylvania.

May 31, 1979.

John G. Swatkoski, Wilkes Barre, Pa., for plaintiffs.

S. John Cottone, U. S. Atty., Scranton, Pa., Gordon D. Laws, Donald Jose, and Jeffrey Axelrad, Torts Section, Civ. Div., U. S. Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

In this action brought under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., plaintiff, Emery R. Letoski, seeks to recover damages for injuries sustained by him on March 22, 1974, when his vehicle was struck in the rear by an automobile being operated by an employee of the United States Food and Drug Administration (FDA). While plaintiff's original injuries were orthopedic in nature, he developed a far more serious traumatic neurosis and this forms the primary basis for this damage claim. Evidence, including substantial psychiatric testimony, was received at trial on November 14–17, 1977; December 16, 1977; and April 28, 1978. In addition, Paul Chodoff, M.D., a psychiatrist, was appointed by the court as an impartial medical witness pursuant to Rule 706 of the Federal Rules of Evidence and his report was filed January 2, 1979. Dr. Chodoff's deposition was taken by the parties and the transcript filed with the court on March 13, 1979. Oral presentations by counsel were made April 27, 1979. The record has now been closed and the case is ripe for decision.

## FACTS

On March 22, 1974, plaintiff Emery Letoski, was 29 years of age, married for the second time to Mary Letoski and the father of an eleven-year old son who resided with plaintiff's first wife. Mr. Letoski was employed by Carter Rubber Co. (Carter) as a machinist earning approximately $4.30 per hour for a forty-hour workweek period. He had previously been elected Union Shop Committeeman and Shop Steward at Carter which had a work force varying between 150 and 250 employees. Mr. Letoski was happily married, had an extremely healthy sexual relationship with his wife, was athletically inclined, played the accordion, performed his union functions regularly and adequately, was considered "outgoing," was well liked by his peers, and, all in all, enjoyed an active social life. At that time he was in his third year in the evening school at Wilkes College, where he was an average student, and had a career objective as a federal mediator or labor negotiator. There were no objective signs or indications of a personality defect or mental deficiency and plaintiff had not suffered from any orthopedic disturbance prior to his stopping his 1973 Volkswagen in observance of the red light on Kidder Street, Wilkes-Barre, Pa., at 7:43 A.M., March 22, 1974. At that time plaintiff's vehicle was struck from the rear by a government vehicle being driven by Bruce Dandridge, an FDA employee (defendant has conceded that the accident was the result of Dandridge's negligence), and the force of the impact pushed plaintiff's vehicle one to one and one-half car lengths, causing him to strike his head, chest and stomach on the steering mechanism. Plaintiff's immediate thought was that he was going to be killed and he experienced dizziness and nausea as well as pains in his head and shoulders. That evening he called his family physician, Dr. Edmund W. McGrath, who took X-rays, which were negative, diagnosed cervical strains and sprains, and prescribed muscle relaxants and a cervical collar. Plaintiff continued to experience pain, stiffness and restriction of motion in his neck and back, had headaches, became fatigued, felt weak and had difficulty sleeping and concentrating. Dr. McGrath advised plaintiff not to return to work and continued to treat him with muscle relaxants and tranquilizers. On April 24, 1974,

954

plaintiff went to Dr. Lewis L. Rogers, an orthopedic surgeon, who diagnosed an extension-flexion type injury to soft tissue of the neck, back and shoulders, commonly called a whiplash injury, which was causing pain and restricted motion in those areas, and recommended that he refrain from working, continue to wear the cervical collar, and engage in muscle-rebuilding exercises. Plaintiff returned to work on April 29th, not because he felt that he had recovered, but because he couldn't afford to remain idle. He also remained in night school although the pain and weak feeling remained, he couldn't concentrate properly, was becoming forgetful, had to purchase a tape recorder in order to recall the lectures, and had his wife help him prepare his notes. Plaintiff remained under Dr. McGrath's immediate care but in addition to his orthopedic complaints, the symptoms of dizziness, insomnia, and extreme fatigue persisted.

Dr. McGrath discharged plaintiff from his care on July 8, 1974, believing that he had done all he could for plaintiff's orthopedic injuries. Plaintiff's symptoms did not abate and beginning in July, he had episodes of anxiety concerning his ability to get his breath and fears of dying which were manifested by trembling and, in some instances, crying. His sexual desires diminished and he demonstrated no interest in his prior diversions of accordion playing and athletic activity. Plaintiff believed that these troubles were related to his physical injuries and that he could eventually "fight them off." In September or October, 1974, becoming alarmed about his condition, Mrs. Letoski suggested that he consider seeing a psychiatrist but he didn't react favorably to this suggestion, declaring that he wasn't "crazy" and that he would work everything out. Plaintiff was able to pursue his employment and school work [1] although he was not functioning normally. In that regard, one of his college professors, Dr. Robert Warner, testified that plaintiff for some reason attended two sections of the same course which he was teaching, sat staring vacantly in class, acted as if there was something wrong with him and the professor wondered "what the devil he was doing in college." A coworker, Robert Leonardi, stated that in the fall and winter of 1974 he noticed significant changes in plaintiff—that he was missing union meetings, developed a faraway look in his eyes, handled grievances carelessly, and became difficult to understand, e. g., he kept repeating the phrase "in a sense." Throughout this period up to May 1975, he continued to withdraw from any social life, began grinding his teeth while sleeping, became more difficult to live with and constantly derided himself for his inability to perform sexually. Nevertheless, he still was satisfied that he could overcome these disorders and regain his health.

On May 6, 1975, while lifting a basket of shoes at work, he suffered pains in his left arm and left chest. He was again treated by Dr. McGrath who prescribed pain relievers and muscle relaxants. Dr. McGrath referred plaintiff to an orthopedic surgeon, Dr. Joseph Sgarlet, on May 21, 1975, and on July 24, 1975, plaintiff reported to the Geisinger Medical Clinic for outpatient diagnosis and treatment. In the meantime, on June 5, 1975, he returned to his employment but his previous symptomatology intensified and he left on June 19, 1975, and, except for a half day in September, he has been unable to work to this day. Starting in August 1975, Dr. McGrath noticed what he described as plaintiff's "changing condition" but did not immediately suspect a psychological basis for it. Plaintiff's spells of headaches, trembling, anxiety, despondency, fainting spells, and fear of impending death increased. Although plaintiff lost 10 pounds immediately following the accident, his weight stabilized until June 1975, after which he lost more than 25 pounds. On November 26, 1975, Dr. McGrath referred him to Dr. DeBonis, a cardiologist, because

1. Inexplicably his grades were higher in the spring semester of 1974, and although they slipped in the fall of 1974 and spring 1975 semesters, they still were not adversely affected by his predicament. While this factor is puzzling, it still does not undermine my other findings.

of chest pain complaints, who concluded that the pains were not caused by heart disease. On January 26, 1976, plaintiff submitted to a neurological examination and brain scan at Geisinger Clinic after Dr. Jeffreys, a Geisinger neurologist, opined that his symptoms were secondary to anxiety and hyperventilation. Subsequently, Dr. Jeffreys recommended that plaintiff see a psychiatrist.

On March 4, 1976, plaintiff was examined for the first time by a psychiatrist, Dr. William K. Grossman. Dr. Grossman noted plaintiff's complaints of dizziness, light-headedness, tinnitus, head pains and sensations of choking. While finding him alert and adequately oriented, because of his decreased ability to concentrate and recall, Dr. Grossman determined him to be almost nonfunctional, commenting that it was hard to imagine his being able to perform on a job.[2] Dr. Grossman referred plaintiff to Dr. Isadore Krasno, a clinical psychologist, who subjected him to various psychological testing and concluded that plaintiff was suffering from a severe anxiety neurosis and possibly some organic factors were involved. He believed that plaintiff was depressed, with reduced intellectual efficiency and was preoccupied with his physical symptomatology. Dr. Krasno felt that plaintiff needed protracted, intensive psychotherapy and, because of the possible organic etiology, he arranged for plaintiff to be tested further by Dr. Francis R. J. Fields, Chief Psychologist at the Lebanon, Pennsylvania, Veterans Hospital. Dr. Fields tested plaintiff on April 10, 1976, and found him unable to perform complex tasks or decision making, or to function at the level of his academic qualifications. He believed plaintiff's prognosis to be poor but thought that he could receive some significant psychotherapeutic benefit. Plaintiff returned to Dr. Grossman for four visits in August 1976, and was treated with various chemotherapy, such as lithium, mellaril, thorazine, and valium, but appeared unable to tolerate these drugs. Dr. Grossman's final diagnosis was that of nonpsychotic brain syndrome secondary to trauma accompanied by somatic anxiety. According to Dr. Grossman, the prognosis was exceedingly poor and the chances minimal that he could improve with treatment. In addition, it was his judgment that any employment would have to be noncomplex, nonrepetitive, and with no stress factors. Plaintiff was next examined psychiatrically by Dr. Anthony Turchetti on September 14, 1976, who noted symptoms of fatigue, loss of appetite, diminished drive, irritability, sexual diminution, lack of concentration, and described plaintiff's appearance as that of a frightened, helpless, clinging child. His diagnosis was that of moderately severe hysterical neurosis, conversion type, with anxiety, depression and phobic tendencies. He found a direct causal relationship between the accident of March 22, 1974, and the symptoms manifested by plaintiff and stated that the prognosis was guarded with insight therapy as the recommended treatment. When Dr. Turchetti examined plaintiff again on March 29, 1977, he found his condition to have deteriorated from moderately severe to severe. In the meantime, on March 25, 1977, plaintiff was seen by another psychiatrist, Dr. Joseph Kowalski, who concluded that plaintiff suffered from traumatic and anxiety neurosis with slight depression which was attributable to the automobile accident. He found plaintiff to have very little understanding of his psychological problems and determined him to be nonfunctional on a day-to-day basis. He believed the prognosis to be poor because plaintiff didn't appear to improve under prior treatment and, after three years, the problem was now chronic. Dr. Kowalski saw plaintiff again on October 11, 1977, and, once again, plaintiff made complaints of difficulty with breathing, trembling, palpitations, sexual inadequacy, grinding of his teeth, and a morbid fear of death. After his visit, Dr. Kowalski realized that plaintiff had not received optimal treatment up to this time (plaintiff's ongoing therapy was confined to taking 5 mgs. of valium four times a day) and discussed a structured

---

2. This action was commenced March 10, 1976.

inpatient setting for three months. Plaintiff was not receptive to this suggestion because of the expense involved and also because he felt he could remedy his condition without such a psychiatric regimen. Dr. Kowalski regarded plaintiff as unemployable at that time and considered his prognosis to be poor.

On October 13, 1977, at the request of the Government in preparation for trial, Dr. Robert L. Sadoff, a psychiatrist, examined plaintiff and noted symptoms of anxiety, depression, and trembling, as well as difficulty in expressing himself. Dr. Sadoff offered a diagnosis of anxiety neurosis and depression. From his review of plaintiff's pre-accident history, he believed him to have been an overachiever, very active and under great pressure, who would be inclined to become depressed and feel deprived if there was a break in his busy routine. He stated that at that time plaintiff was very seriously ill from a psychiatric standpoint and acknowledged that there was a direct link between his illness and the accident of March 22, 1974. It was his opinion that his present condition was triggered by the accident, although he felt there were other contributory factors, such as plaintiff's pre-accident personality, which elicited an excessive response to the accident, and additional physical insults, e. g., the lifting incident in May 1975.

Commencing on January 10, 1978, plaintiff began a course of psychiatric treatment by Dr. Kowalski who could see no significant change in his anxiety symptoms but found that his worst symptom had become his fear of death. In addition, it was proving difficult to reassure him that no one was trying to hurt him. Dr. Kowalski initially attempted to control plaintiff's symptoms with medication, principally antidepressants and tranquilizers, but plaintiff developed adverse side effects and was very reluctant to continue with this approach. At the end of February the drug treatment was discontinued as Dr. Kowalski decided that medication could not remove the symptomatology. Thereafter, and to the present time, plaintiff's treatment consisted of analyses and free association tests in which plaintiff was given simple tasks to perform but, according to Dr. Kowalski, plaintiff was impatient, wanting to get things done in a rush, and little progress was made. After the litigation has ended, Dr. Kowalski plans to recommend a partial hospitalization program where plaintiff can be encouraged to do things in a structured environment but the doctor believes that there is not much hope for a great deal of change and that he will never return to a state of functioning that will enable him to obtain any type of gainful employment.

On April 17, 1978, the Government arranged for another psychiatric evaluation of plaintiff, this time by Dr. Joseph Wolpe, a pioneer in the field of behavioral therapy. After exposing plaintiff to a series of tests, Dr. Wolpe diagnosed a severe anxiety neurosis which, if left untreated, would get progressively worse but, if treated with behavioral therapy methods, could present a 90% chance of full recovery. He described plaintiff as sincere, genuine and not a malingerer who could be taught to unlearn his fears. Nevertheless, at the time of his examination, he acknowledged that plaintiff was under great emotional stress, exhibited tremors, belched incessantly, and projected psychosomatic complications. Dr. Wolpe was satisfied that plaintiff was then unable to work.

Dr. Paul Chodoff was appointed by the court to evaluate plaintiff's condition and examined him on December 13, 1978. He noted plaintiff's expression of profound bewilderment and confusion concerning his illness and his continued belief that there was something physically wrong with him that had not yet been detected. It was his diagnosis that plaintiff suffers from a severe and chronic traumatic neurosis with hypochondriacal and phobic features and he regarded his illness as entirely psychogenic. He was emphatic in finding a causal relationship between the accident and plaintiff's present condition. Dr. Chodoff postulated that plaintiff was predisposed to react with greater intensity to an external trauma and that the minor trauma of the automobile accident caused disproportionate ef-

fects. It was his opinion that plaintiff could be successfully treated but considered the litigation as a secondary gain factor which was unconsciously restraining his motivation to recover. Successful treatment, according to Dr. Chodoff, could be either psychotherapeutically or behaviorally oriented or may combine both approaches.

In summary, the medical testimony demonstrated that plaintiff incurred orthopedic injuries at the time of the accident but that gradually an adverse psychological overlay developed, i. e., an anxiety neurosis, which totally disabled him. The main points of challenge by the Government are (1) that plaintiff had a pre-existing orthopedic problem; (2) that plaintiff had substantially recovered from the initial injury when he was injured again in the lifting incident on May 6, 1975, which constituted an intervening and superseding cause; (3) that plaintiff's neurotic problems relate to a pre-existing personality defect which would have occurred without the automobile accident or, at least, were independently caused by the May 6th incident; and (4) that plaintiff's emotional difficulties can be treated and corrected by behavioral therapy.

All of the competent medical evidence in the record confirms that plaintiff is suffering from a severe anxiety neurosis with manifestations of fear, depression and hysteria. The evidence is so overwhelming on this point that there is no need to review and analyze the evidence bearing on this issue. In-court observations of plaintiff confirm beyond doubt that he is a troubled, dejected, confused, spiritless, and emotionally spent human being. Therefore, the court accepts this as plaintiff's present condition and will discuss evidence concerning it only as it applies to the other issues heretofore identified.

## JURISDICTION

Prior to a discussion of the merits, a threshold jurisdictional issue must be disposed of. Before a tort action can be filed against the United States under the Federal Tort Claims Act, an administrative claim must be presented to the appropriate federal agency, and the agency must either deny the claim in writing or fail to take action on it for six months. 28 U.S.C. § 2675(a). If an administrative claim is not presented to the appropriate federal agency within two years of the alleged incident, the claim against the United States arising out of that incident is forever barred. 28 U.S.C. § 2401(b). By regulations promulgated by the Attorney General under 28 U.S.C. § 2672, a claim is not deemed to have been presented to a federal agency as required by 28 U.S.C. §§ 2401(b), 2675(a) until the agency receives a completed Standard Form 95 or some other written notification of the incident with a demand for money damages in a sum certain. 28 C.F.R. § 14.2(a).

■ Plaintiff's Standard Form 95, which was submitted to the federal agency on April 29, 1974, did not include a demand for money damages in a sum certain as required by 28 C.F.R. § 14.2(a), because the blanks on the form for personal injury and total amount of claim were not filled in with a dollar amount. However, by letter, dated September 16, 1974, plaintiff's counsel submitted a demand for $4,500 in settlement of the claim. The letter specifically stated, inter alia, that the $4,500 was to be considered "as a reasonable payment for settlement of this matter" and added the comment that "I need not call your attention to the peripheral items of damage which would necessarily be claimed, i. e., pain and suffering, etc., were we forced into litigation." The reference to peripheral items of damages was obviously not designed to condition or undermine the demand but was merely an effort to persuade the Government to accept the demand and pay the $4,500. I find that the $4,500 figure was intended to be a demand for money damages in a sum certain which, if accepted by the Government, would have been binding on the plaintiff and would have settled the case. The money demand was definite, not open-ended and fully complied with 28 C.F.R. § 14.2(a).

■ Additionally, under the Federal Tort Claims Act, plaintiff is limited in recovery at trial to the amount he claimed adminis-

tratively unless he can prove intervening facts or that the additional amount claimed "is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency." 28 U.S.C. § 2675(b). Plaintiff filed an administrative claim for $4,500.00 and is limited to that amount unless he can satisfy one of the two conditions mentioned in 28 U.S.C. § 2675(b).

The administrative claim essentially sought damages for an extension-flexion injury, including five weeks of lost wages from March 22, 1974, to April 29, 1974. Plaintiff now claims damages for the anxiety neurosis that slowly developed after the accident but intensified until June 1975, when he became totally disabled and unable to work. At the time the money demand was made on September 16, 1974, plaintiff was suffering from accident-caused neurotic symptoms but did not recognize them as such and believed they were related to his physical problems which he expected to overcome with the passage of time. His family physician treated him for these physical complaints and it was not until January 1976, that any physician advised him to seek psychiatric help. Consequently, the full benefits of medical diagnosis were not available to him when he filed his claim. *Joyce v. United States*, 329 F.Supp. 1242 (W.D.Pa.1971), *vacated on other grounds*, 474 F.2d 215 (3d Cir. 1972). Although his wife suspected emotional problems in September or October, 1974, plaintiff did not share her suspicion and, mindful of his mental state and his determination to get better, it was not unreasonable for him to believe that there was no psychological involvement. While his condition continued to deteriorate, he persisted in trying to cope with his problems and in May 1975, after a lifting incident aggravated his pre-existing orthopedic disorder, he found himself unable to work and his emotional predicament worsened. It is apparent to me that plaintiff honestly believed that his symptoms were physical ones and, like most physical maladies, would improve with the passage of time. He should not be faulted for an understandable inability to recognize an emotional overlay and for his effort not to give in to it. Under the circumstances existing here, he could not, and should not, have been expected to make a cool rational judgment that he was suffering psychologically and should seek out psychiatric help. As Dr. Chodoff observed, plaintiff as late as 1978 still believed there was something wrong with him physically that had not yet been detected. Similarly, in March 1977, Dr. Kowalski noted that plaintiff had very little understanding of his psychological problems. There is no evidence that he refused to consider psychiatric treatment when advised by a physician or someone competent enough to make such a recommendation. His counsel who filed the claim was unaware of any psychiatric consequences and, as previously noted, even his attending physician did not suspect a psychological overlay until sometime after August 1975. I am satisfied that plaintiff reasonably believed his ailments were physical ones that he could overcome in time. When Dr. Jeffreys recommended a psychiatric consultation, he promptly complied and visited Dr. Grossman. The later psychiatric evaluation established that he had a severe emotional disorder and changed the nature of the case for damage evaluation purposes. *Bonner v. United States*, 339 F.Supp. 640, 651 (E.D.La.1972).

## DISCUSSION

### 1. *Pre-existing orthopedic problems*

Defendant's sole source for this contention is the written report of Dr. Sanford B. Sternlieb, an orthopedic surgeon, wherein he stated that plaintiff has "some early degenerative disc disease of the cervical spine which was apparently made symptomatic by the injury which he incurred." This is a slim reed in support of defendant's position and will not be accepted here, especially in light of the contrary testimony of Dr. Rogers and Dr. McGrath. I am satisfied that whatever early degenerative disc disease may have existed, it played no role in the orthopedic disturbances that plaintiff developed following the automobile accident.

## 2. The May 6, 1975, lifting occurrence was an intervening and superseding cause of plaintiff's present disability

Defendant's support for this assertion consists of Dr. McGrath's deposition, the evaluation at Geisinger Hospital, plaintiff's work record, and Dr. Sadoff's testimony that this event was significant. However, Dr. McGrath did not state that the May 6th happening was a superseding factor and specifically related all plaintiff's physical and emotional problems to the automobile accident. The Geisinger report never focused on any relationship between the original accident and the May 6th event and cannot be considered as supportive of the Government's superseding cause position. Further, while Dr. Sadoff may have regarded the May 6th incident as significant, he specifically testified that the original accident was the direct link that triggered plaintiff's present condition although subsequent happenings, including the lifting episode on May 6th, contributed and added to this condition. This is hardly convincing evidence to establish the theory of superseding cause. It is true that plaintiff was unable to work after May 6, 1975, except for a two-week stint, but this is fully consistent with Dr. Roger's opinion that it was predictable that, because of his tenuous orthopedic position, plaintiff would injure himself if he attempted lifting and the resulting disabling condition was, at most, an aggravation of the pre-existing orthopedic problems caused by the automobile accident. Moreover, all of the remaining evidence related plaintiff's present disability to the original accident and no one identified any later involvement as being anything more than a contributing or aggravating factor. Dr. Chodoff specifically ruled out any causal relationship between plaintiff's symptomatology and the lifting of the basket. While the lifting incident was significant in that it may have helped stimulate plaintiff's deteriorating emotional condition, it was not the source of his physical and mental ailments and did not constitute a superseding and intervening cause. I reject any suggestion that plaintiff's orthopedic condition had been corrected and that his emotional problems were under control prior to May 6, 1975.

## 3. Pre-existing personality defect

The Government advances the argument that plaintiff had an obsessive-compulsive personality, was an overachiever, operated under the pressure of work and school, was apprehensive of a contemplated change in lifestyle resulting from his desire to have children, and had a predisposition toward emotional illness, which, together with the May 6, 1975 accident, were the causes of his present mental illness. This theory is synthesized by culling bits and pieces from the comments and observations of certain of the medical witnesses and structuring a medical conclusion different from any advanced by any of the medical witnesses themselves. The evidence in this record that I accept demonstrates that plaintiff was a normal, active, pleasant, and popular person prior to the automobile accident. There was nothing of significance indicating a predisposition toward mental illness and he appeared to be handling life's pressures without difficulty. While he may have set challenging goals for himself and may have been operating at an arduous pace, I am confident that he would have continued without complication were it not for the collision on March 22, 1974. In that regard, Dr. Chodoff testified that it was unlikely that plaintiff would have his present symptomatic picture unless the accident occurred which he described as the "triggering action." These findings, together with the strong medical testimony from both parties establishing causation, compel the conclusion that plaintiff's physical and emotional problems were initiated and caused by this unfortunate occurrence.

## 4. Future treatment

It is around this issue that the main controversy between the parties swirls. The opinions on recovery prognosis and modes of treatment vary considerably. Dr. Kowalski and Dr. Grossman view the prognosis as exceedingly poor, Dr. Grossman predicting that the chances of improvement with

psychiatric treatment to be one in twenty, while Dr. Kowalski judged plaintiff as being untreatable, except possibly in a hospitalized environment, but that he would never return to a state of functioning that would enable him to obtain gainful employment. Dr. Krasno envisioned protracted, intensive psychotherapy with only a small degree of anticipated improvement and Dr. Turchetti thought treatment would be difficult and was doubtful that there would be any improvement.

On the opposite end of the spectrum, Dr. Sadoff anticipates a good recovery because plaintiff functioned so well prior to the accident and Dr. Wolpe predicted a 90% chance of full recovery if plaintiff could be treated promptly with behavioral therapy. Dr. Sadoff contemplated a treatment program of one to five years, although conceding the prognosis would not be favorable if plaintiff had not responded and returned to work in that time frame, while Dr. Wolpe believed that forty to fifty behavioral therapy sessions over a period of seven months would be sufficient. Dr. Wolpe warned that if plaintiff is left untreated, his condition would get progressively worse.

Because of the obvious disagreement on prognosis and treatment, the court appointed Dr. Paul Chodoff as an impartial medical witness. As previously noted, Dr. Chodoff considered plaintiff to be treatable either by psychotherapy or behavioral therapy, or in combination, but strongly insisted that the present litigation had to be eliminated before proper patient motivation would be forthcoming. After a year in which plaintiff could be induced into a more favorable attitude, Dr. Chodoff believed a treatment timetable of one to two years would be sufficient. Although conceding that plaintiff's condition was chronic and that he was unemployable, Dr. Chodoff estimated a better than 50% chance that plaintiff would respond within two years to treatment and advanced further that he would be "very much better" in five years.

It is the court's opinion that plaintiff is treatable and I adopt Dr. Chodoff's reasoning that once the secondary gain factor of litigation is eliminated, plaintiff will become more receptive to treatment and that either psychotherapy or behavioral therapy, or a combination thereof, would bring plaintiff back to normal functioning. While plaintiff's hypochondriacal inclination is obvious, his strong preaccident performance would certainly point to an ability to respond to appropriate treatment. The behavioral approach with its emphasis on systematic desensitization appears to hold out hope for success in a case such as plaintiff's. This is not meant to minimize the value of conventional psychotherapy because it will probably require a combination of both to bring about the contemplated beneficial result. As all medical witnesses agreed, however, no one can guarantee that the treatment will be successful. I do feel that plaintiff has not received optimal treatment up to this point, largely because of his own unwillingness to cooperate—manifested in some degree by his quickness to indicate inability to tolerate any drug regimen. It is here where I am persuaded by Dr. Chodoff's placing significance on the secondary gain factor because it is not unreasonable to assume that with the litigation behind him, plus his conclusion that he has been vindicated, plaintiff would be more inclined to plunge more readily into the treatment process. At least we hope and pray that he does.

But concluding that plaintiff is treatable supplies only part of the answer. The question is, how long? With due deference to all expert witnesses, I believe an amalgam of their estimates is the more reasonable approach. The range of time swings from seven months to never, with some bordering closer to the five-year mark. Accordingly, it is my determination that plaintiff's pain and suffering can be eliminated and he can be returned in five years to the type of employment he would have been suited for if it were not for the accident. This specific prediction is not made with complete confidence but only because the responsibility falls on my shoulders to make that inexact judgment. With recognition of that personal limitation, I find that plaintiff's entitlement to damages will cease as of June 1, 1984.

## DAMAGES

Defendant has argued that plaintiff violated his duty to mitigate damages by failing to seek psychiatric treatment since at least September 1974, and especially in not pursuing an active course of treatment until January 1978. The Government asks the court to reduce or limit damages awarded to plaintiff accordingly.

In my analysis of the Government's prior contention that plaintiff's disabling neurotic condition was reasonably discoverable by him in September 1974, I pointed out that plaintiff reasonably believed that his ailments had a physiological origin; that they would improve with the passage of time, that he could not be expected to make a completely reasoned judgment about his emotional condition; and that he promptly sought psychiatric aid when so advised by competent authority. The same interpretation applies here on the issue of mitigation of damages. I believe that plaintiff sought medical assistance immediately and frequently for relief of his symptoms and followed the medical advice proffered to the best of his ability. He also moved quickly when told to see a psychiatrist. Moreover, he submitted to a drug regimen prescribed by Dr. Grossman, his first psychiatric contact, and did all that was asked of him. He assented to psychological evaluation when requested and there is no suggestion in this record that he refused or ignored treatment at any time. I find, therefore, that plaintiff did attempt to treat and cure his condition and cannot be charged with failure to mitigate his damages.

Plaintiff worked on a piece-rate basis and the work he turned out averaged $4.30 per hour for a 40-hour week regardless of the number of hours he actually worked. His wage loss to March 15, 1979, was $33,535 and he lost ten additional weeks since, or $1,892, making a total wage loss to date of $35,427. He will be unemployable until June 1, 1984, which will be 5 years at $8,944 [3] or $44,720, which when reduced to present worth using a 6% factor amounts to $37,675.38.

His medical expenses to date are $10,758.07. Dr. Chodoff estimated that it would cost $4,000 per year to complete successful treatment of plaintiff. Allowing for a diminishing amount of treatment as plaintiff's condition improves, I believe $15,000 would be needed to cover this cost. Based on his past experience and assuming sufficient progress, drug requirements should not exceed $1,000. Under Pennsylvania law, future medical expenses are not reduced to present worth. *Yost v. West Penn Railways Co.*, 336 Pa. 407, 9 A.2d 368 (1939).

Plaintiff's pain, and especially his suffering, will be graded during different time periods. I had more than adequate opportunity to observe plaintiff closely during the trial. He was a pathetic, dispirited, pitiful person to watch. His hands and face trembled noticeably. His facial expressions displayed deep anguish, bewilderment, depression, and hopelessness. He sobbed openly, wrung his handkerchief incessantly, and showed the results of heavy mental strain. He had been described by the examining psychiatrists with such terms as "frightened," "helpless," "clinging child," "seriously ill," "very depressed," "great emotional stress," "tremulous," and "despondent" and he gave every indication at trial that these symptoms had not abated. It would be difficult to imagine physical ailments that would cause more visible suffering than existed here. No good purpose would be served in itemizing and identifying the degree and depth of his suffering, except to say that it was substantial. Government counsel did not seriously challenge this item of damage except to say that it should have been mitigated, a position which I have rejected under the circumstances here present.

Accordingly, after careful consideration, I conclude that just compensation for pain and suffering here to be $10,000 for the period from March 24, 1974, to June 1, 1975; $25,000 per year for the period from June 1,

---

**3.** I have utilized his earnings record at Carter Rubber Co., although my judgment as to his earning capacity upon entering the labor relations field would be approximately the same.

1975, to June 1, 1979; $25,000 per year from June 1, 1979, to June 1, 1981, at which time it is expected that his treatment will begin to alleviate his symptoms; $20,000 from June 1, 1981, to June 1, 1982; $10,000 from June 1, 1982, to June 1, 1983; and $5,000 from June 1, 1983, until June 1, 1984, when he is symptom free and able to resume employment.

The above recitation of the facts shall constitute findings of fact as required by Fed.R.Civ.P. rule 52, 28 U.S.C.

### CONCLUSIONS OF LAW

1. Plaintiff filed an administrative claim under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., within the statutory period which fully complied with the statute and the regulations promulgated thereunder.

2. The Federal Food and Drug Administration, the agency to which the claim was submitted, did not make a final disposition of the claim within six months and this was a final denial of the claim for the purposes of 28 U.S.C. § 2675(a).

3. Plaintiff's disabling neurotic problems constituted newly discovered evidence not reasonably discoverable at the time the administrative claim was filed. 28 U.S.C. § 2675(b).

4. The negligence of Bruce Dandridge, an employee of the Federal Government, was the proximate cause of the plaintiff's physical and mental injuries.

5. Plaintiff did not suffer from any preexisting orthopedic problems or personality defects and the lifting incident of May 6, 1975, was not an intervening or superseding cause which would relieve defendant from liability.

6. Plaintiff is entitled to damages of $294,860.45 and judgment will be entered for that amount against the United States. The Clerk is hereby directed to enter judgment in accordance with this memorandum.