OPINION OF THE COURT
Edward J. Amann, Jr., J.
In this timely filed claim, the claimant Rachel Skaria seeks to recover damages for personal injuries sustained by her on April 18, 1978. These injuries resulted from the negligent maintenance of 440 Lenox Road, Brooklyn, New York. Her husband, Skaria Samuel, seeks damages for the loss of his wife’s services and for medical expenses incurred by him on her behalf.
On April 18, 1978, and prior thereto, the claimant Rachel Skaria was employed as a registered nurse in the Downstate Medical Center. She lived across the street at 440 Lenox Road in a building used by the center to house its employees and their families. The building was maintained by the State of New York and contained 108 residential units. Above the ground floor the six-story building is divided into east and west sections, each containing its own self-service elevator and stairwell.
Entrance to the main floor is gained through two sets of front doors. The exterior door, which is unlocked, leads into *712 a vestibule and another door. The interior door was kept locked and was equipped with a self-closing device. The use of the elevators was also controlled for security purposes. Tenants, including the claimants, were supplied with a memorandum from the building management informing them that the elevators were restricted from going to the basement nightly at 8:00 p.m.
Each evening at 8:00 p.m. the assistant superintendent of the building locked the elevators with a key which prevented them from going to the basement. The basement of the building contained a laundry and several other rooms, including a locker room with approximately 60 lockers. The interior stairwells were open and except for the basement, the building did not contain any recessed areas. The claimants lived on the fifth floor in the west section of the building.
On the night of the incident, Rachel Skaria left the hospital at approximately 11:55 p.m., walked across the street and opened the front door of the building with her key. She entered the elevator and pressed the fifth-floor button. However, when the elevator reached the second floor it stopped and an unknown man entered. She tried to leave the elevator, however, he produced a knife and demanded money. After the elevator reached the fifth floor, he refused to let her out and instead pushed the basement elevator button. The elevator did not stop at the ground floor, but proceeded to the basement. When it reached the basement Mrs. Skaria’s assailant then took her to the locker room where he raped her. Mrs. Skaria was slashed on the fingers of her right hand as she attempted to resist the rape.
Mrs. Skaria testified that approximately one month prior to the incident she had complained to the building management that the interior door could be opened without a key. She also testified that approximately two weeks before the incident she spoke to Mr. Perez, the building superintendent, and told him that the door was not closing properly. Mr. Perez told her that he would have it repaired. Kodumthara Thomas, a friend of the claimants and another tenant in the building, testified that prior to the incident the interior door could have been opened without *713 a key, if it were pushed hard enough. Frank Baldwin, the assistant superintendent of the building, admitted that prior to April 17, 1978, the night of the incident, the front door could have been pushed and opened without a key, however, he did not know for how long a period the condition had existed. Mr. Baldwin also testified that it was his duty to lock the elevators every evening at 8:00 p.m. He stated that on the night of the incident, he had locked the elevator.
George Peters, the State employee in charge of operating the building, admitted that there had been problems with the hinges of the interior door, which caused the door to sag, preventing it from closing properly. He also admitted that the door was repaired on at least five occasions during the six months preceding the attack. Work orders revealed that on October 13,1977, work was done on the door check. Again, on February 2,1978, the front door check was again repaired. Finally, on April 18, 1978, the date of the incident, a work order was put in to repair the front door lock, that work was completed on the following day.
In addition to Baldwin and Perez, at least one elevator key was in the possession of the security force. Baldwin admitted that every evening the security force unlocked the elevator in order to get to the basement to change into their workclothes.
The Downstate Medical Center is located in the east Flatbush section of Brooklyn. A New York City police officer testified that the building is located within the 71st Precinct, which he described as an “A” house, a police department designation for a precinct located in a high-crime area.
The law is well established that an owner or possessor of land is not an insurer of a visitor or tenant’s safety. He does, however, have a duty to exercise reasonable care. (Basso v Miller, 40 NY2d 233.) Moreover, “[w]here a person voluntarily assumes the performance of a duty, he is required to perform it carefully, not omitting to do what an ordinarily prudent person would do in accomplishing the task”. (Wolf v City of New York, 39 NY2d 568, 573.) In the case at bar, there is no doubt that the defendant knew or *714 should have known that because of the neighborhood, the buildings’ tenants were susceptible to injury from outsiders. Recognizing the danger, the building management put a lock on the interior door and equipped.the door with a self-closing device. As an additional precaution, it equipped the elevators with a locking device, which prevented them from going to the basement. The management had advised the tenants of this fact in a written memorandum. There is an abundance of evidence in the trial record that during the six-month period prior to the occurrence, the door had not been locking properly; that repairs had been made on at least four occasions prior to the incident and on a fifth occasion, the day after the incident. The State was therefore negligent in failing to properly repair the interior door. The State was also negligent in failing to lock the west elevator. Had the west elevator been locked, it is safe to assume that the attacker would have taken Mrs. Skaria’s money and departed, having no secluded area in which to ravish his victim. Here the State had foreseen the dangers of leaving the basement accessible during the evening hours and had taken precautions to eliminate the dangers by requiring that the elevators be locked. However, on the evening of the incident, it failed to fulfill the obligation, which it had voluntarily assumed and upon which Mrs. Skaria had relied. (Nallan v Helmsley-Spear, Inc., 50 NY2d 507.)
Accordingly, the court finds that the State was negligent and that its negligence was the proximate cause of the claimant’s injuries. It further finds that there was no conduct on the part of the female claimant contributing towards the happening of the occurrence.
The claimants, natives of India, were married in 1972. Mrs. Skaria was a nurse and Mr. Skaria was a sergeant in the Indian Army. Due to his commitment to the army, she came to the United States first and he remained in India with their child. Ultimately, he came to the United States and after several moves, settled at 440 Lenox Road. At the time of her attack, the couple had two small children. Following her attack Mrs. Skaria was treated at Kings County Hospital emergency room for her knife wounds. At that time she did not complain of the rape, explaining that *715 she did not want to tell the doctor that she had been raped because he was also an Indian. The following day, however, she consulted the Crisis Center of the Mayor’s Task Force located in Kings County Hospital and reported the rape.
It was Mrs. Skaria’s testimony that prior to the assault she did the housework, cooking, laundry, banking and other household chores in addition to working. It was also her testimony that prior to the occurrence she engaged in sexual relations with her husband two or three times a week. Subsequent to the rape she was unable to engage in sexual relations for a period of eight or nine months; and thereafter, only about once a month. Mrs. Skaria testified that she no longer enjoys sex, and stated that following the rape she had nightmares and was unable to sleep or function in the house. She also testified that she has nightmares and is unable to function in her capacity as a housewife.
Mrs. Skaria remained out of work for three weeks, and was afraid to go out on the street without an escort. As a result, Mr. and Mrs. Skaria decided to leave New York and, thereafter,' moved to Texas. On June 21, 1978, Mrs. Skaria gained employment as a registered nurse in Texas.
In the course of the attack, Mrs. Skaria sustained lacerations of the fingers of the right hand and the fourth finger of the left hand, requiring 13 sutures. At present, she has four nonkeloid scars on the fingers of her right hand, each less than one-half inch in length. The scars are not disfiguring. Mr. Skaria testified that he presently does most of the household chores and that he has had sexual relations with his wife not more than once a month, due to her lack of desire.
Dr. Carmine Casella, a clinical psychologist, testified that following the incident, he treated Mrs. Skaria six times during the period April 26, 1978 to May 30, 1978. It was his testimony that as the result of the rape, Mrs. Skaria is suffering from a phobic reaction and rape syndrome. He described it as a severe emotional disorder resulting in exaggerated fears, which prevent a patient from functioning properly. He ceased treating Mrs. Skaria when she moved to Texas, but recommended that she seek *716 further help. During the course of the trial he examined her again, at her lawyer’s request, and found that her condition had worsened. He tested her and found that her responses showed more phobic reaction and that she is unable to deal with reality. Dr. Casella testified that Mrs. Skaria told him that she did not seek treatment in Texas because she did not want anyone to know about the rape. Dr. Casella advised her to seek help and opined that her condition would be permanent, unless she sought help.
At the time of the occurrence, Mrs. Skaria earned $15,000 per year. She was absent from work for a three-week period and although she was paid, she lost sick benefits and annual leave to which she had been entitled. Dr. Casella’s bill amounted to $300 and the Kings County Hospital bill was $100.
In assessing damages the court will not include in its award any damages sustained by claimants after January 1, 1979. The claimant has the burden of proving that her injuries are permanent, which she failed to do. Dr. Casella expressly testified that her condition would be permanent unless she sought medical help. Implicit in that answer is the suggestion that she would have been helped had she sought medical attention. Additionally, the claimants are bound by the proposition of law that an injured plaintiff has an affirmative duty to mitigate damages. Mrs. Skaria had a duty to seek out and follow a physician’s advice.[1] (Matter of Zanotti v New York Tel. Co., 48 AD2d 192.)
The claimants left Brooklyn on or about June 7, 1978 and moved to Texas where they bought a home. Mrs. Skaria found employment at the Brookhaven Medical Center on or about June 21, 1978, stayed at that facility six months, subsequently leaving for a nursing position at the Parkland Memorial Hospital, where she is still employed. The court believes that an approximate six-month period was sufficient time for the claimants to adjust to their move and for Mrs. Skaria to seek medical attention and therefore restricts its award until that date.
At the end of the entire case the State’s attorney moved to dismiss the claim. Having reserved decision, the court *717 now denies the State’s motion to dismiss and awards the claimant Rachel Skaria $80,000 in payment of her pain and suffering and for the permanent injury suffered by her and all special damages that she is entitled to recover.
The court also awards to her husband, Skaria Samuel, $7,500 for the loss of services of his wife and the reasonable value of medical and hospital expenses paid on his wife’s behalf.[2]

. The court does not find her excuse, that she wanted to conceal her rape, to be reasonable.

. The court awards the claimants no punitive damages, because the State has not been found guilty of any intentional, wanton, willful or malicious conduct.