Hileen P. SALAS, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 94–CV–62H.

United States District Court,
W.D. New York.

July 21, 1997.

Daniel Theodore Lukaski, DiNardo, DiNardo & Lukkasik, Buffalo, NY, for plaintiff.

Mary K. Roach, U.S. Attys. Office, Buffalo, NY, for defendant.

## DECISION AND ORDER

HECKMAN, United States Magistrate Judge.

In this action brought under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et. seq.,* the plaintiff seeks to recover damages for injuries she sustained on November 30, 1991, when the vehicle she was driving was struck on the passenger side by an automobile operated by FBI Special Agent John Culhane. The plaintiff sustained relatively minor physical injuries consisting of whiplash and cervical and lower back strain for which she was treated with muscle relaxants and physical therapy but was not hospitalized. Subsequently, however, the plaintiff developed a far more serious psychiatric breakdown diagnosed as somatoform disorder, and this forms the primary basis for the damage claim.

The evidence, including substantial psychiatric testimony, was received at trial on November 12 through 15, 18 through 20, and 22, 1996. Following trial, the court directed the parties to submit proposed findings of fact and conclusions of law focusing on three areas: (1) mitigation of damages, and specifically, whether plaintiff's refusal to take the medicine prescribed by Dr. Dickinson should preclude her recovery, (2) appropriate measures or prior awards for pain and suffering, and (3) whether plaintiff would have become psychologically disabled in the absence of an accident. The parties were directed to file these submissions by January 15, 1997, with further oral argument scheduled for Tuesday, January 21, 1997. At the request of counsel, the above dates were extended, and oral argument was heard on March 13, 1997.

### FACTS

The testimony at trial established the following facts. On November 30, 1991, the plaintiff was 49 years old and had been employed since 1981 as a high school Spanish teacher at Grover Cleveland High School in the City of Buffalo. The plaintiff had received excellent evaluations from her years as a teacher and testified that she liked her job. Although her exact wage was not made a part of the record, the parties have stipulated as to her lost wages in this case, taking into account appropriate deductions for collateral sources.

The plaintiff was born in Buffalo in 1942 and graduated from Bennett High School. Following high school, she received an Associates degree from Michigan State University, and a Bachelors degree and Masters degree from the State University of New York at Buffalo. She also completed all work toward a doctorate except the dissertation itself. At an early age, she showed a proficiency in foreign languages, and has studied Hebrew, French, Portuguese and Spanish. As to her Spanish proficiency, she described herself as completely bilingual. She lived for some period of time with her first husband in Venezuela in the early 1960s and later pursued graduate work at the University of Madrid in Spain.

The plaintiff married Francisco Salas in 1962 and had two sons of that marriage. Shortly after their second son was born, she was divorced and returned to Buffalo where she lived with her parents while attending graduate school. She raised the two children basically on her own. At the time of the trial, her oldest son David was thirty-three years of age and her second son Darryl was thirty-two. David had been diagnosed a schizophrenic in 1984. In 1988, David was hit by a car and sustained a serious brain injury requiring surgery. He now lives independently in Buffalo. Darryl holds a law degree and is currently at New York University studying for a doctorate in Business Administration. The plaintiff also has a third son, Alex, who was sixteen years old and attending high school at the time of trial. Alex's father is Jose Morales, who lived with the plaintiff for four to five years beginning in the late 70s.

In 1974, both of Ms. Salas' parents died and she began having problems with her two older sons, who were then teenagers. During that time, she suffered from depression

and saw a social worker named Janice Stiller at Jewish Family Services. She re-established contact with Janice Stiller in 1984 when her son David was diagnosed as a schizophrenic. The plaintiff received counseling from Janice Stiller, who was then working at the Erie County Medical Center outpatient clinic (ECMC), on and off from that time through June of 1993, when Ms. Stiller left her job for medical reasons.

Despite these challenging circumstances, the plaintiff maintained a productive work record. Prior to her employment with the Buffalo City Schools, she worked full-time for the Educational Opportunity Center, for a CETA program, and then as a paralegal for Neighborhood Legal Services. In addition, she was active in several Hispanic organizations and some political campaigns. She was engaged in volunteer work at the time of the accident.

On the date of the accident, the plaintiff had been volunteering at a refugee center in Buffalo, where she had been asked to drive a refugee to the hospital. She and her friend, Maxine Insera, dropped the refugee off at the Buffalo General Hospital and then proceeded north on Ellicott Street. When the plaintiff got to the intersection of Ellicott and North Streets, she stopped at the stop sign, looked in both directions and proceeded slowly through the intersection. At the stop sign, she could see approximately two car lengths to her right and could not see any cars approaching. At some point as she was pulling into the intersection, the plaintiff observed the defendant's vehicle approaching her from the right, traveling west on North Street at what she described as a rapid rate of speed. When she did see the vehicle driven by Special Agent Culhane, she described him as looking nasty, like the look on the face of someone on bumper cars.

The plaintiff stopped her car, but the vehicles collided in any event. The only damage to the plaintiff's car was a small dent on the front passenger side of the vehicle. Both the plaintiff and her passenger were wearing seat belts. At the time of the impact, the plaintiff testified that her head snapped back. Following the accident, the driver of the other vehicle, FBI Agent John Culhane, got

out of his car, came up to hers and started accusing the plaintiff of failing to stop at the stop sign. It is conceded by the government that Special Agent Culhane is the one who did not stop at the stop sign and that he was negligent in the operation of his automobile.

The plaintiff refused medical treatment at the scene of the accident, but did go to the emergency room the next day, complaining of confusion, dizziness, headaches, pain in her knees and pain in her neck and back. Her emergency room records show a diagnosis of cervical and lumbar muscular spasms and left knee contusion. She was discharged with prescriptions for Motrin and Flexeril, a muscle relaxant. She then attempted to see her regular internist, Dr. Norman, but was late for her appointment. The doctor would not see her personally, but did give her a prescription for Toradol for headaches, Zantac for her esophagus and Pamelor for depression. She saw him one week later and he referred her to a chiropractor.

The plaintiff decided to switch doctors at this point because she had been unable to see Dr. Norman for her first appointment. She then started seeing another internist, Dr. Sielski. She continued to treat with Dr. Sielski for her neck and back pain up until the time of trial. Dr. Sielski advised the plaintiff not to return to work and treated her with muscle relaxants, tranquillizers and antidepressants. The plaintiff saw a number of other health care providers in the ensuing years including neuropsychologists, neurologists, an orthopedist, an ophthalmologist, psychiatrists and social workers. The plaintiff was instructed to engage in physical therapy, which she did, and she also received chiropractic treatment. The plaintiff has complained of back pain, muscle spasms, soreness in her neck, migraine headaches, visual problems (for which she received visual therapy), numbness in her fingers, loss of sense of smell, loss of sensation, cognitive deficits including problems sequencing numbers, recognizing faces, getting confused and lost, and problems with her memory. She was at times suicidal and very often depressed.

The plaintiff attempted to return to work shortly after the accident but felt extremely

tired and had great problems with her memory and her back. She was able to work only a few days. She was again unsuccessful when she attempted to return to work in September of 1992. At that time she worked for only four days and reported that she could not continue because she was disoriented in space and time, entered the wrong classroom and had an altercation with a student because she did not recognize the student as being hers.

The plaintiff testified that prior to the accident, she loved teaching and intended to work until age 65 in order to enhance her benefits in the retirement system. At present, plaintiff tutors students in Spanish two hours a week and also drives herself to various doctor and physical therapy appointments as well as to "revaluation counseling," a type of peer group counseling. She now sees Dr. Mostert for psychiatric treatment, Dr. Berzon for physical therapy, Dr. Carroll for chiropractic treatments, Dr. Gordon for her vision and Dr. Pretula, a homeopathic doctor. She is currently taking Tegretol, an anticonvulsant and a mood stabilizer prescribed by her psychiatrist. She reports experiencing three or so minor seizures. In addition to the Tegretol, she takes Toradol for headaches, Zantac for stomach and esophagus problems and Zoloft for depression.

The plaintiff's taking of antidepressants was the subject of extensive testimony. She has been on and off antidepressants in the past, but chose not to take them on a long-term basis, apparently because of side effects. For instance, the record disclosed that the plaintiff took Pamelor, a tricyclic antidepressant, for more than one year following the accident, and it did make her feel less depressed. However, she claims that it made her allergic to the sun and she stopped taking it. Approximately three weeks prior to trial, she began taking Zoloft, one of the new generation of antidepressants known as selective serotoningic reuptake inhibitors.

After the accident, the plaintiff reports being especially anxious about having suffered a brain injury. Indeed, a great many of the medical examinations in this case were designed to determine whether the plaintiff suffered from organic brain injury. However, all the doctors who examined the plaintiff now agree that she did not sustain a brain injury in the accident but rather that her physical complaints, with the possible exception of the back and knee pain, were unconsciously exaggerated as part of her psychiatric condition. Other than the brief trial work periods described above, the plaintiff has been unable to work since the accident.

All of the doctors in this case also agree that the plaintiff is not "malingering" as that term is used in the medical profession. As explained, this term means the intentional exaggeration of physical symptoms. Rather, the doctors feel that the plaintiff is unintentionally exaggerating physical symptoms which are disproportionate to the actual impact of the accident.

The plaintiff's symptoms have improved in certain areas but have not in many others, as a result of which she currently suffers episodes of extreme anxiety, confusion, pain in virtually every part of her body and limited affect. Two lay witnesses testified as to the dramatic change in the plaintiff's personality since the accident. Plaintiff's brother, Hyman Polakoff, is a CPA with a practice in Amherst, New York. He testified that the plaintiff gave very good care to her children prior to the accident, was a very outgoing personality and was active in various organizations including a women's Latin group. Although the plaintiff used to ask him for help on occasion with her son David, she lived independently. Since the accident, he has noticed an extreme change in her personality. He says she is now weak, has trouble walking, her conversations are rambling, she speaks in a very quiet low voice and is irritable and takes things personally.

The passenger in plaintiff's vehicle at the time of the accident, Maxine Insera, also testified as to the plaintiff's current condition. They have been close friends for many years, living in the same part of town and both raising children as single parents. She described Hileen as less energetic, much quieter, less assertive, with many fewer organizational skills and less able to cope with the stresses of life. As far as her own injuries in the accident, she was also jolted. She

bumped her knee and head, felt extremely achy, but recovered without medical treatment.

As to the plaintiff's lumbar and cervical strain, the experts at trial differed in their assessment of this condition. Dr. Sielski, the plaintiff's treating internist from 1992 through the present, testified at trial that the plaintiff continues to suffer to this day from chronic muscular cervical and lumbar syndrome caused by the motor vehicle accident. He gave the opinion that this was a permanent injury and would preclude the plaintiff from returning to work. In contrast, the government's neurologist, Dr. Margaret Paroski, testified that the plaintiff did sustain lumbar and cervical whiplash injury as a result of the accident but that she had recovered as of June 19, 1992 (the date of Dr. Paroski's examination) without permanent injury. Although the plaintiff has continued to seek physical therapy and chiropractic care to the current date, Dr. Paroski indicates that this was not necessary or medically indicated.

As to the plaintiff's psychiatric state, various labels have been applied, but all of the doctors do agree that the motor vehicle accident triggered a psychiatric condition. For instance, Dr. Marcelle Mostert, plaintiff's treating psychiatrist, diagnosed the plaintiff as suffering from somatoform disorder. Dr. Mostert has treated the plaintiff at the ECMC outpatient clinic of psychiatry from 1992, about one year after the accident, to the present date. She explained that this disorder involves the unconscious exaggeration of physical complaints which are disproportionate compared to the actual physical injury suffered. This is a recognized psychiatric condition. Dr. Mostert also diagnosed the plaintiff as suffering from major depression and depersonalization disorder, both of which she determined to be pre-existing conditions. She concluded that the motor vehicle accident triggered a recurrence of depressive symptoms, but that it had no impact on plaintiff's depersonalization disorder. In Dr. Mostert's opinion, it is the somatoform disorder and plaintiff's deeply held belief that she suffered a serious brain injury in the accident, which makes her unable to work.

Although Dr. Mostert recognized that an argument could be made to diagnose the plaintiff as suffering from borderline personality, she was more cautious in her assessment than other psychiatrists and did not make that diagnosis in this case. She notes that plaintiff, despite her pre-existing psychiatric conditions and various setbacks in her life, had been coping well prior to the accident in the sense of maintaining work and family relationships, but since the accident has been unable to do so.

The plaintiff also called clinical psychologist Rafael Javier, who spent sixteen hours with her in 1993 and administered a series of psychological tests. He concluded that the plaintiff suffers from borderline personality and is undergoing post traumatic stress syndrome as a result of the accident. He also found that she suffered cognitive deficits in Spanish as a result of the accident but that she was not suffering from organic brain syndrome. He views her prospects as guarded and opined that she could not return to work as a Spanish teacher.

Finally, plaintiff called Dr. Homer Reed, who holds a Ph.D. in neuropsychology. He evaluated the plaintiff by reviewing her records and later by visiting with her. He felt that she had a dramatic decrease in coping skills as a result of the accident and could not return to work. He stated that her prognosis was extremely bleak. However, Dr. Reed's testimony was not credible because it was disclosed during cross-examination that the state in which he practices (Massachusetts) ordered a revocation of his license for violation of ethical standards regarding social relationships with patients. Although this order was stayed while on appeal, nonetheless this significantly discredits his testimony and I do not give it any weight in my decision.

The government called Dr. Margaret Paroski, who as I indicated above, testified as to plaintiff's lumbar and cervical whiplash injury. She also ruled out organic brain syndrome. She felt that the plaintiff was unconsciously magnifying her symptoms and that treatment of her depression would probably alleviate many of them, although she would need more information to know for sure.

She specifically stated that the plaintiff was not malingering and she agrees with Dr. Mostert's diagnosis of somatoform disorder.

The government also called Dr. Ellen Dickinson, a psychiatrist who examined the plaintiff three times in 1993. The plaintiff was sent to Dr. Dickinson for treatment, but Dr. Dickinson dropped her as a patient because the plaintiff was unwilling to follow Dr. Dickinson's recommendations as to medication. Dr. Dickinson placed plaintiff in a somewhat more serious psychiatric category than Dr. Mostert, finding that she was suffering from schizo-affective disorder, depressive type and borderline personality. She recommended that plaintiff take three medications for her condition: (1) a mood stabilizer such as Lithium, Tegretol or Valproic acid, (2) an antidepressant such as Prozac, Zoloft, Paxil, or perhaps Elavil or Pamelor, and (3) an antipsychotic such as Trilafon or Stelazine. Dr. Dickinson testified that the motor vehicle accident caused an aggravation of plaintiff's pre-existing psychiatric condition. However, she opined that the plaintiff could return to work if she took the three medications which Dr. Dickinson felt were indicated in this case.

In sum, the medical testimony demonstrated that the plaintiff incurred lumbar and cervical strain at the time of the accident and that, in addition, the minor trauma of the automobile accident triggered a major psychiatric deterioration which totally disabled the plaintiff.

### DISCUSSION

The main arguments of the government at trial were (1) the plaintiff was herself negligent in proceeding through the intersection with limited visibility, (2) the plaintiff's lumbar and cervical strain resolved itself within six months of the accident, (3) the plaintiff's somatoform disorder was triggered by other stressful events occurring around the time of the accident, such as problems with her son Alex and stress at work, (4) the plaintiff exaggerated her symptoms in order to improve her position in the lawsuit, (5) the plaintiff's psychiatric problems relate to a pre-existing personality disorder and schizo-affective disorder, depressive type, which would have been triggered eventually without the automobile accident, and (6) the plaintiff's emotional problems could essentially be cured by taking prescribed medication. In its post-trial brief, the government also argued that plaintiff has failed to demonstrate that her enjoyment of life was diminished after the accident.

All of the competent medical evidence in the record confirms that the plaintiff is suffering from a severe somatoform disorder and depression. Although the doctors initially thought she might have sustained a brain injury in the accident, this has now been ruled out by all. Despite evidence to the contrary, the plaintiff nevertheless believes that she suffers from organic brain syndrome. In-court observation of the plaintiff confirms that she is a depressed, dependent, childlike, confused, spiritless and disoriented individual. She rarely opens her eyes. Her speech on the witness stand was a high-pitched monotone, barely audible despite numerous reminders to speak up. All of the competent medical evidence confirms that the plaintiff is currently unable to return to her job as a high school Spanish teacher. Accordingly, the court accepts this as the plaintiff's present condition and will discuss each of the arguments raised by the government.

### 1. COMPARATIVE NEGLIGENCE.

█ The proof shows that Agent Culhane failed to stop at the 4–way stop sign at the intersection of North Street and Ellicott Street. The government has conceded liability, but argues that the plaintiff's own negligence was, in part, the proximate cause of her injuries. The pictures in evidence show that there is a brick building on the northeast corner of North Street and Ellicott Street. Plaintiff testified that her field of vision to the right down North Street at the stop sign was approximately two car lengths. On the basis of this testimony, the government argues that the plaintiff should have inched her car forward into the intersection until she could see further down North Street. Had she done so, the government argues, plaintiff would have seen the govern-

ment vehicle approaching and could have avoided the accident.

This argument must be rejected. Plaintiff conducted herself in a safe and cautious manner in coming to a full stop at the stop sign and in stopping her car when she saw the government vehicle approaching. There is no evidence that she was speeding, came to an incomplete stop or failed to look before proceeding through the intersection. Even if she had seen the government vehicle earlier in the chain of events, she could have reasonably assumed that it would have stopped at the stop sign.

Accordingly, I find that the plaintiff was not negligent, and that the only proximate cause of the motor vehicle accident was Agent Culhane's negligence.

## 2. LUMBAR AND CERVICAL STRAIN.

As to the lumbar and cervical strain, the witnesses at trial differed in their assessment of this condition. Clearly, the plaintiff did receive a whiplash type injury in the accident. This is confirmed in the emergency room records, which show cervical and lumbar muscular spasms. Dr. Sielski, the internist who treated the plaintiff from 1992 through the present, testified that the plaintiff continues to suffer to this day from chronic muscular and cervical and lumbar syndrome caused by the motor vehicle accident. He gave the opinion that this was a permanent injury and would preclude the plaintiff from returning to work. In contrast, a neurologist called by the defense, Dr. Margaret Paroski, testified that the plaintiff did sustain a lumbar and cervical whiplash injury as a result of the accident but that she had recovered as of June 19, 1992 (the date of Dr. Paroski's examination) without permanent injury. Although plaintiff continued to seek treatment to the current date, Dr. Paroski stated that this was not necessary and was not medically indicated. Dr. Collard, an orthopedist, confirmed this testimony.

I find that the defense position is more credible on this point. Dr. Sielski is not an orthopedist and did not seek out other specialists to assist him in treating this pain syndrome. According to both Dr. Collard and Dr. Paroski, the plaintiff's range of mo-

tion in her spine and neck were normal, which would not be expected if she had disabling back or neck pain. It is more likely, given the plaintiff's psychiatric diagnosis, that the pain she now reportedly suffers in her neck and back is merely another manifestation of her somatoform disorder. This does not mean the pain is not real to the plaintiff, only that its degree of severity, especially five years after the accident, is disproportionate compared to the initial physical injury.

Accordingly, I find that the plaintiff suffered a neck and back sprain as a result of the accident but that this condition, in and of itself, was not disabling as of June 1992.

## 3. CAUSATION.

Defense counsel argues that the plaintiff's somatoform disorder was triggered by other stressful events in her life, not by the motor vehicle accident. Specifically, the government points to Janice Stiller's therapy notes reflecting problems with plaintiff's son Alex, with her job and with working through memories of childhood sexual abuse.

This argument is not supported by the medical record. Every doctor who testified about plaintiff's psychiatric condition stated that the motor vehicle accident either caused the psychiatric deterioration or aggravated a pre-existing psychiatric condition. According to the psychiatrists' testimony, plaintiff had a pre-existing personality disorder and a predisposition toward depression, but was able to cope until the accident. They each identified the accident as the event that precipitated a chronic somatoform disorder or schizo-affective disorder which was totally disabling. This included Dr. Dickinson, the psychiatrist called by the defense.

The doctors testified that they associated this psychiatric reaction with the accident because plaintiff repeatedly verbalized her strongly held belief that she had suffered brain damage in the accident. In addition, plaintiff related feelings of extreme anxiety generated by the look on Agent Culhane's face prior to the accident and by his aggressive and accusing manner afterward.

The law is well-established that the defendant must take a plaintiff as he or she finds her and hence may be liable for damages for aggravation of a pre-existing illness or for precipitation of a latent condition. *See, e.g. Tobin v. Steisel*, 64 N.Y.2d 254, 485 N.Y.S.2d 730, 475 N.E.2d 101 (1985) (recovery allowed for psychological injuries precipitated by explosion), *McCahill v. N.Y. Transportation Co.*, 201 N.Y. 221, 94 N.E. 616 (1911) (wrongful death recovery allowed where injury to thigh and knee precipitated delirium tremors causing death), *Evans v. S.J. Groves & Sons Co.*, 315 F.2d 335, 346–349 (2d Cir.1962) (recovery allowed after thrombosis of sinuses triggered by blow to head), *'A.A.' v. State*, 43 Misc.2d 1004, 252 N.Y.S.2d 800 (N.Y.Ct.Cl.1964) (awarding damages where slight physical injury aggravated and exacerbated pre-existing condition producing schizophrenia); *Steinhauser v. Hertz Corp.*, 421 F.2d 1169 (2d Cir.1970) (new trial ordered where jury held that plaintiff could recover only if accident alone produced schizophrenia, as opposed to triggering schizophrenia), *Bartolone v. Jeckovich*, 103 A.D.2d 632, 481 N.Y.S.2d 545 (4th Dep't 1984) (recovery allowed for aggravation of pre-existing paranoid schizophrenic condition).

Given the strong medical evidence from both parties establishing causation, I find that plaintiff's emotional problems were caused by the accident.

## 4. MALINGERING.

All of the medical doctors agreed that the plaintiff was not malingering in that she was not intentionally exaggerating her symptoms. Rafael Javier, a clinical psychologist, ruled out malingering by using standardized psychological tests, including the Minnesota Multifaceted Personality Inventory. Dr. Mostert testified that plaintiff's functioning at home was inconsistent with malingering, and that the plaintiff was functioning at such a low level emotionally—like a child—that she was not capable of that type of deception. Dr. Paroski testified that the plaintiff was not consciously exaggerating her symptoms but rather unconsciously doing so, as in a conversion order or somatoform disorder.

Dr. Dickinson also at no time suggested that the plaintiff was purposefully exaggerating her symptoms.

The government nevertheless argues that the plaintiff's interest in secondary gain and in getting attention caused her to exaggerate her physical and emotional maladies. I fail to understand the difference between this alleged lack of credibility and malingering. Having observed the plaintiff's demeanor at trial, and given the long period of time that has now elapsed since the accident, I find it unlikely that the plaintiff is attempting to deceive the court or her many health professionals by exaggerating her symptoms—at least not on a conscious basis.

Accordingly, I reject the government's argument that the plaintiff exaggerated her symptoms in order to improve her position in this lawsuit.

## 5. LIKELIHOOD THAT DETERIORATION WAS UNAVOIDABLE.

In response to the plaintiff's claim that the auto accident was the precipatory cause of her psychological deterioration, the government argues that plaintiff should not be awarded any damages because she was likely to deteriorate in any event. The government cites *Steinhauser v. Hertz Corp., supra*, 421 F.2d at 1173, in which the court stated:

> Although the fact that [the plaintiff] had latent psychiatric tendencies would not defeat recovery if the accident was a precipatory cause of schizophrenia, this may have a significant bearing on the amount of damages. The defendants are entitled to explore the probability that the [plaintiff] might have developed schizophrenia in any event. While the evidence does not demonstrate that [the plaintiff] already had the disease, it does suggest that she was a good prospect. Judge Hiscock said in *McCahill v. N.Y. Transportation Co.*, [201 N.Y. 221, 94 N.E. 616 (1911) ] 'it is easily seen that the probability of later death from existing causes for which a defendant was not responsible would probably be an important element in fixing damages but it is not a defense.'

*See also, Maurer v. United States*, 668 F.2d 98 (2d Cir.1981).

In support of this argument, the government relies on testimony from Dr. Dickinson. Dr. Dickinson testified that viewing the plaintiff's "thirty year history of mental illness" prior to the accident, it would in all probability be only a matter of time before some life event triggered a reaction such as the plaintiff experienced after the motor vehicle accident. She stated that persons suffering from schizo-affective disorder and borderline personality are much more sensitive or reactive than most people, and that minor events can set them off. She felt that the plaintiff was already beginning to falter due to stresses at work, at home and in her past around the time of the accident, as reflected in her therapist's notes from the Fall of 1991.

However, a much different picture emerged from Dr. Mostert's testimony. Dr. Mostert rejected a diagnosis of schizo-affective disorder because she had not observed any evidence of psychosis in the plaintiff. In addition, while she acknowledged that the plaintiff suffered from depersonalization disorder and major depression prior to the accident, she did not see that as evidence that the plaintiff would ultimately become disabled by her psychiatric symptoms. She characterized the plaintiff as someone who was stress sensitive and stated that she would expect plaintiff to continue to experience recurrent depression in response to life events. However, she noted that the plaintiff had coped with such symptoms over the course of many years and had gone through extended periods of time when the symptoms were diminished. Dr. Mostert testified that the plaintiff's somatoform disorder was a new condition, caused by the accident, which has been the source of her inability to work.

I do not find that Dr. Dickinson's testimony should be given much weight on this issue. First, Dr. Dickinson only met with the plaintiff three times in 1993, for one or two hours per meeting. Thus, her exposure to the plaintiff was limited, especially when compared to her treating psychiatrist's long-term relationship with plaintiff. Second, while it is true that Janice Stiller's notes reflect counseling prior to the accident, I refuse to find that the therapy notes reflect that plaintiff was "seriously mentally ill for thirty years." The counseling started in 1984, intensified in 1988 after her son's accident and continued up to and after the motor vehicle accident in 1991. Ms. Stiller's notes do reflect numerous instances where the plaintiff felt anxious and depressed. Nevertheless, the plaintiff was never hospitalized for her complaints and was only infrequently medicated. She was not diagnosed with any condition other than "adjustment disorder with mixed emotional features," a general catch-all diagnosis for counseling patients.

Dr. Dickinson also overstated or misstated important facts about the plaintiff's background. She testified that the plaintiff had long periods previous to the accident when she was unable to function. This assertion is contradicted by plaintiff's steady work record. Dr. Dickinson testified that for a vast majority of the time, the plaintiff's parents, rather than plaintiff, took care of plaintiff's children. Although the plaintiff did live with her parents after her divorce, this is an overstatement of the record. Dr. Dickinson testified that the plaintiff was unable to manage one of her children and that as a result he spent most of his teen years, beginning at age thirteen, in an institution. The record shows, to the contrary, that one son was placed in a police institution for six months after assaulting and injuring the plaintiff.

It was obvious that Dr. Dickinson was angry at the plaintiff because she refused to take the medication Dr. Dickinson recommended. Rather than working with the plaintiff for a length of time, Dr. Dickinson rejected her as a patient. It was evident from Dr. Dickinson's demeanor on the stand that she disliked the plaintiff and felt that her refusal to take medication was unjustified. Given the limited time Dr. Dickinson had treated the plaintiff, I find it difficult to credit this somewhat hasty judgment. Dr. Dickinson did concede that some patients are legitimately concerned about the side-effects of medication and that many patients do refuse medications. She would normally work with the patient, like Dr. Mostert is now, rather than refuse to treat the patient further. Dr. Dickinson did not satisfactorily explain why this patient was treated differently.

Finally, I find this testimony to be conclusory and speculative, unsupported by medical or psychiatric data. Given the complexities, subtleties and uncertainties of psychological or psychiatric illnesses, the strong and uncontradicted testimony as to the plaintiff's demeanor (smiling, pleasant and active) and work record prior to the accident, and the lack of evidence in plaintiff's past to show a predisposition toward mental illness (such as prior hospitalizations or psychotic episodes), I reject the government's argument as to the likelihood of plaintiff's psychiatric deterioration.

## 6. DUTY TO MITIGATE DAMAGES.

The main controversy between the parties centers on the issue of mitigation of damages. The government argues that plaintiff should not be awarded any damages after November 1993, when she refused to take the combination of three psychiatric medications recommended by Dr. Dickinson.

██ Under New York law, an injured party has a duty to mitigate her damages, and in that regard is required to make a reasonable effort and to act as a reasonable, prudent person would under the circumstances. *State v. Samfred Beltline Corp.*, 31 A.D.2d 865, 866, 297 N.Y.S.2d 466 (3d Dep't 1969). The burden of proving that the plaintiff failed to mitigate damages is on the defendant. *Cornell v. T.V. Dev. Corp.*, 17 N.Y.2d 69, 268 N.Y.S.2d 29, 215 N.E.2d 349 (1966).

██ The government relies on the diagnosis and prognosis of Dr. Dickinson, and argues that the plaintiff had no reasonable basis for rejecting the drug regimen she prescribed. In support, the government cites several New York cases which hold that an injured plaintiff is bound to submit to reasonable medical treatment to alleviate her condition. Those cases, which all involved physical injuries, found that medical treatment may reasonably be rejected if it is improper, dangerous to life or has dangerous side effects, or if the plaintiff is unable to afford the treatment. The government argues that none of these circumstances are present in plaintiff's case, and that the plaintiff has therefore failed to mitigate her damages.

The government has not cited any New York cases that address the duty to mitigate damages where the plaintiff's injury is psychiatric in nature. This court located a single case on the issue, *Skaria v. State of New York*, 110 Misc.2d 711, 442 N.Y.S.2d 838 (N.Y.Ct.Cl.1981). In *Skaria*, the plaintiff, who had been raped, claimed that she suffered from nightmares, lost her enjoyment of sex, and was unable to function as a housewife. She sought treatment initially with a psychologist, but then moved to another state and discontinued all treatment. Her psychologist opined that the plaintiff's phobias would become permanent without treatment. The court determined that the plaintiff should have had sufficient time to seek medical care within six months after she moved. The plaintiff's damages were therefore limited to that date. *Skaria* is distinguished from the present case. Here, the government does not allege that plaintiff failed to seek medical treatment in general, but rather that she rejected a particular course of treatment.

Testimony was presented at trial regarding the general circumstances under which psychiatric patients reject medication. For instance, both Dr. Mostert and Dr. Dickinson agreed that patients can rationally reject medications because of their side effects. Dr. Dickinson testified that it often takes a period of experimentation to arrive at a combination of medications with few adverse effects and which relieve the patient's symptoms. She described this process as more of an art than a science. Moreover, there is evidence in the record which would justify exercising caution with psychiatric medications. The plaintiff took Prozac, an antidepressant, in the past but did not like it because it made her feel jumpy, a recognized side effect of the drug in some people. While on Tegretol, the plaintiff reported being sleepy and experiencing poor motor planning, episodes of confusion and stereotype gesturing. She also testified that she experienced an allergic reaction to sunlight while on Pamelor. Dr. Mostert stated that Pamelor and other tricyclic antidepressants that were recommended to the plaintiff do have

more serious side effects than the "new generation" of antidepressants now available.

Dr. Mostert and Dr. Dickinson also agreed that in addition to rejecting medication upon experiencing side effects, it is also common for psychiatric patients to refuse medication outright. Dr. Mostert stated that this is often the result of a general belief that drugs cannot alleviate emotional difficulties and that such problems must be overcome by one's own willpower. She testified that an accepted method of dealing with such resistance is to continue to see the patient, attempt to gain his or her trust, and eventually persuade the patient to try something different. In that regard, Dr. Mostert has succeeded in getting the plaintiff to take a mood stabilizer since September of 1995 and recently convinced her to take an antidepressant as well.

In determining the reasonableness of plaintiff's actions, there are other factors to consider as well. First, it was apparent from the testimony of the plaintiff and her physicians that the plaintiff believes her cognitive difficulties stem from a brain injury and that her other physical symptoms are also causally related to the motor vehicle accident. Thus, the plaintiff could have reasonably believed that her condition was physiological, rather than psychiatric, in nature. Also, while it is clear that the plaintiff has been hesitant to take certain psychiatric medications, she has taken some for extended periods of time. She has also consistently engaged in psychotherapy with Dr. Mostert and others, which is a recognized, conventional form of treatment for somatoform disorder. Of further relevance is the fact that the plaintiff has not refused medical assistance generally. To the contrary, she sought treatment for her physical injuries the day after the accident. In addition, the plaintiff readily agreed to undergo psychiatric assessment upon the recommendation of one of her physicians. In fact, since the accident, plaintiff has consistently seen many doctors and for the most part followed their medical advice.

Finally, I do not find that Dr. Dickinson's recommended treatment regimen or her prognosis should be given much weight. Dr. Mostert, the plaintiff's treating psychiatrist disagreed with Dr. Dickinson's recommendation that plaintiff take an antipsychotic. In fact, none of the physicians who examined or treated the plaintiff recommended the same combination of medications as Dr. Dickinson. Also, on the basis of three sessions with the plaintiff, Dr. Dickinson stated that she was 95 percent certain that the plaintiff could return to work soon by following her recommended treatment plan. I find the prognosis for such instantaneous results to be conclusory and speculative, particularly in light of Dr. Dickinson's own testimony as to the complexities involved in arriving at a therapeutic dosage of psychiatric medications. Further, the prognosis of every other physician who examined the plaintiff was much more guarded. Dr. Mostert noted that the plaintiff had taken some psychiatric medications for extended periods of time, but that she still remained very impaired throughout. While Dr. Mostert does expect to see some improvement, she anticipates a lengthy course of treatment. In sum, Dr. Dickinson's prognosis for a virtually assured and complete recovery is not supported by the record.

Accordingly, viewing the record as a whole, I find that plaintiff has made reasonable efforts to treat and cure her condition and that she cannot be charged with failure to mitigate her damages.

## 7. ENJOYMENT OF LIFE.

The government argues that the plaintiff should not be allowed to recover for pain and suffering because she has failed to show that her life is any different now than it was before the accident. Specifically, the government claims that the plaintiff's family and social relationships have either remained unchanged or have improved since the accident, that her activities outside of her work have remained the same, and that any pain and suffering she may experience as a result of living with a psychological problem is no greater than it was before the accident.

I agree with the government's claim that there was insufficient evidence presented at trial to determine the extent to which plaintiff's relationships and volunteer activities changed after the accident. However, I dis-

agree with the government's conclusion that they therefore remained uncharged and may have even been enhanced.

Also, the government's assertion that any pain and suffering the plaintiff is now experiencing as a result of her psychiatric condition does not exceed that which she experienced prior to the accident is without merit. It is true that the plaintiff suffered from depression both before and after the accident. However, the government totally ignores the pain and suffering resulting from the physical manifestations of the plaintiff's somatoform disorder, including her deeply held belief that she is incapacitated by a serious brain injury. The record is replete with evidence of the plaintiff's numerous complaints of painful and debilitating symptoms that, regardless of medical evidence to the contrary, are very real to her.

There are other factors to consider as well. It was clear from the plaintiff's testimony at trial that she considered herself to be a highly intelligent, accomplished and community-oriented individual prior to the accident. She was proud of her education and activities and was obviously distressed by her decreased assertiveness and coping skills following the accident.

Yet another factor is the pain and suffering resulting from the plaintiff's inability to work. The government argues that the plaintiff found her work extremely stressful and difficult, and therefore derived little or no satisfaction from her job. While it is true that the plaintiff spoke to Janice Stiller at times about difficulties with students or her school administrators, this alone does not compel the conclusion that the plaintiff has not suffered any loss. To the contrary, the plaintiff testified that she loved her job and it was evident that she derived great satisfaction from teaching. She maintained an excellent attendance record, even during periods of personal adversity, and received excellent evaluations as well. She was involved outside the classroom with her students and in curriculum development and related educational matters. Her overall record and willingness to engage in extracurricular activities is evidence that the plaintiff placed considerable importance on her profession.

Accordingly, I find that the automobile accident caused the plaintiff physical and emotional pain and suffering in that it resulted in her somatoform disorder, her decreased ability to cope with everyday life and her inability to work.

### DAMAGES

The issue of damages in this case is complicated by the fact that the medical opinions regarding plaintiff's prognosis for recovery vary a great deal. Dr. Mostert and Dr. Javier record the plaintiff's prognosis as poor. Dr. Mostert testified that given the five years of disabling symptoms to date, it is unlikely that the plaintiff could return to work "anytime soon." While Dr. Mostert expected to see some alleviation of plaintiff's depression and anxiety now that the plaintiff is taking an antidepressant, she did not expect to see the plaintiff return to her pre-accident level of functioning because of the somatoform disorder and the plaintiff's deeply held belief that she has suffered a brain injury. Dr. Mostert also noted that the plaintiff had been on an antidepressant for approximately fifteen months following the accident and was still very impaired throughout that time. Dr. Dickinson, in contrast, stated that she is 95 percent sure that the plaintiff could return to work by following her treatment regimen.

As I stated earlier, I find Dr. Dickinson's testimony to be less credible than Dr. Mostert's with respect to the plaintiff's prognosis under a recommended treatment regimen. Dr. Dickinson, who saw the plaintiff on only three occasions in 1993, has no knowledge of the plaintiff's current status and was unaware that the plaintiff now takes both a mood stabilizer and an antidepressant and still has difficulty functioning.

However, in addition to the findings above, it is also apparent that the plaintiff has not had the full benefit of complete treatment up to this point. She only recently began taking an antidepressant in combination with a mood stabilizer and regular psychotherapy sessions. Hopefully, once the stress of litigation is over and the medications are at therapeutic doses, the plaintiff will experience suf-

ficient relief from her symptoms that she can return to work.

The question that remains is how long it will take to return plaintiff to that level of functioning. Considering the testimony of the experts, whose estimates as to plaintiff's ability to return to work ranged from soon to never, I believe that the plaintiff's pain and suffering can be eliminated and she can be returned to work in five years. Recognizing that this prediction is inexact, I find that plaintiff's entitlement to damages will end as of August 1, 2002.

### 1. Lost Wages.

The parties have stipulated that the plaintiff's past economic loss through December 31, 1996, taking into account collateral source reductions, is $104,190. The parties also agreed on calculations of plaintiff's future lost wages to the ages of 62 and 65. The plaintiff was born on September 15, 1942, and will be 59 years and 10½ months of age on August 1, 2002.

Accordingly, counsel are directed to meet with the court on Tuesday, **August 12, 1996 at 3:00 p.m.** to determine the amount of plaintiff's economic loss to date and the amount of future lost wages to August 1, 2002, in accordance with the stipulations already entered. The discount rate to be applied to the plaintiff's future loss is 6.7 percent.

Counsel should attempt to reach agreement on these amounts prior to meeting with the court. If no agreement can be reached, counsel are directed to submit their respective calculations to the court on or before **August 8, 1997.**

### 2. Pain and Suffering.

■ As has already been noted, the testimony and in-court observation showed plaintiff to be a depressed, dependant, spiritless and disoriented individual who expresses an almost endless litany of physical ailments.

After careful consideration, I conclude that plaintiff's pain and suffering, while substantial, can be alleviated over time with continued treatment. Accordingly, I find the following to be just compensation: $10,000 per year for the period from November 30, 1991 to August 1, 1998; $8000 for the period from August 1, 1998 to August 1, 1999; $6,000 for the period from August 1, 1999 to August 1, 2000; $4,000 for the period from August 1, 2000 to August 1, 2001; and $2,000 for the period from August 1, 2001 to August 1, 2002. *See Letoski v. United States of America, Food and Drug Admin.,* 488 F.Supp. 952, 961–62 (M.D.Pa.1979).

### CONCLUSION

For the foregoing reasons, I find that plaintiff is entitled to damages for lost wages and pain and suffering. The total amount of damages will be determined after further submissions by counsel, at which time the Clerk will be directed to enter judgment against the United States.

**SO ORDERED.**